## COMMISSIONER OF INTERNAL REVENUE v. ORTON et al.
### No. 10679.

United States Court of Appeals
Sixth Circuit.
March 28, 1949.

Louise Foster, of Washington, D. C., (Theron Lamar Caudle, George A. Stinson, Robert N. Anderson and Louise Foster, all

of Washington, D. C., on the brief), for petitioner.

Clarence D. Laylin, of Columbus, Ohio (Joseph P. Eagleson, John H. Eagleson and Clarence D. Laylin, all of Columbus, Ohio, on the brief), for respondents.

Before HICKS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

HICKS, Chief Judge.

The Commissioner of Internal Revenue petitions for a review of the Tax Court's decision that the taxpayer, Edward J. Orton, Jr., Ceramic Foundation, had overpaid its income tax for the year 1940 in the sum of $337.84. The Commissioner asserted a deficiency of $648.38. The facts were stipulated.

The question is, whether the taxpayer's income is exempt from taxation under Sec. 101(6) of the Internal Revenue Code, 26 U.S.C.A. § 101(6). The pertinent portions of this Section read as follows:

"Sec. 101. Exemptions from tax on corporations.

"The following organizations shall be exempt from taxation under this chapter—

"(6) Corporations, and any * * * fund, or foundation, organized and operated exclusively for * * * scientific, * * * or educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individuals * * *."

The Foundation was established by the will of Edward Orton, Jr., executed October 6, 1928, and probated February 28, 1932. Orton had devoted much of his life to the improvement of ceramic arts and processes. He was a graduate in mining engineering of Ohio State University and later became a member of its faculty and was instrumental in establishing there the Department of Ceramics, of which he became the head. He inaugurated the manufacture in this country of pyrometric cones, which were slender pyramids composed of minerals similar to those in the ceramic bodies, which through standardization of their melting points were of great aid to the firing processes in the ceramic industry.

Prior thereto such cones had been imported from Germany. Orton successfully developed a complete series of superior cones which, through his efforts, were standardized by the Bureau of Standards. Ultimately, he established a laboratory of his own near the Ohio State University campus and privately conducted the business of manufacturing cones. Shortly before Orton's death these activities were housed in new quarters on a new site.

Orton earnestly desired that his endeavors on behalf of the ceramic industry should be continued after his death, and to that end, by his will, he divided his estate into two parcels. Parcel I, consisting of the new quarters and the old plant, buildings, supplies, etc., was devised to a Board of Trustees of seven men, to be known as the Edward Orton, Jr., Ceramic Foundation. The Trustees, for the most part, were designated according to the positions they held and included the President of the Ohio State University; a representative from the Bureau of Standards; the heads respectively of the Ohio State Engineering Experiment Station, and of its Department of Ceramic Engineering; the Secretary and another representative from the American Ceramic Society; and an attorney to be chosen by the Probate Court of Franklin County, Ohio. Except for the attorney, who would be paid reasonable compensation for legal services, the Trustees were to receive for their services $1.00 a year and expenses.

The purposes of the trust, as set forth in the will (Item 2, Sub-item 2), were two-fold. Quoting,—

" * * * The first and principal purpose is to provide a stable and dependable organization for continuing the manufacture and sale of Standard Pyrometric Cones of the highest quality and most exact accuracy that is commercially feasible, at a reasonable price. The second and subsidiary purpose of this trust is to provide a Research Organization for the prosecution of studies and researches for overcoming technical and manufacturing difficulties, and for thus advancing the ceramic arts and industries in the United States."

And with the approval of the Probate Court, the Trustees were authorized "* * * to cease manufacture and to close up the cone manufacturing business, if, for any reason the same has become unable to longer function successfully, or if scientific progress makes it no longer necessary or desirable to continue"—and to dispose of the assets to the Ohio State University.

The will, Item 2, Sub-item 3, after setting out a historical statement concerning the manufacture of pyrometric cones, continued:

*"In this enterprise while manufacturing profit is essential to permit its continuance, it has from the first been my purpose to make financial profit incidental to the principal idea of furnishing to ceramic manufacturers, a mode of controlling or regulating the firing process of their wares with the highest attainable degree of dependability at the lowest reasonable cost. Having been successful in obtaining the confidence of manufacturers of ceramic products, in standard pyrometric cones, it is my desire to assure myself that the manufacturing establishments which I have built up shall continue to fulfill this same useful purpose, upon the same high plane and with the same ideals of public service, after my death."* (Italics ours.)

The will, Item 2, Sub-item 6, further stated:

"It is my intention, in this trust, to provide an organization *not for profit* whose real or ultimate objects are altruistic and wholly devoted to producing industrial, scientific and social betterments, *without any personal or private gain to any one, other than as wages paid for services rendered.* To this end it is my will that the surplus produced by the manufacturing and vending organization known as the Standard Pyrometric Cone Company, shall be expended by the research organization whose product is knowledge given free to all who are interested. * * *" (Italics ours.)

By clause (d) of Sub-item 6, the will provided that:

"* * * the price at which cones shall be sold shall be set to produce a gross income, of which approximately eighty percent will be required to meet the manufacturing costs, including sales, overhead, and the maintenance of proper capital reserves or extensions, depressions, or disasters, and including the cost of experimental work undertaken specifically for the needs of the cone manufacturing process itself. The remainder of the gross receipts of the cone manufacturing business being approximately twenty percent of the same, should be expended upon research."

In the will Orton recommended to the Trustees that salaries be liberal, that profit-sharing be continued and that the price of cones be kept lower than those from other countries.

█ The Tax Court adopted the written stipulation of facts as its own Findings of Fact and held that the taxpayer was a "foundation" as the term is used in the statute. This finding is not seriously controverted but the Tax Court, five Judges dissenting, went further and found that the predominate purpose for which the taxpayer was organized was, in its broadest sense, to promote the science or art of ceramics. The petitioner attacks this conclusion and insists that the taxpayer was neither organized nor exclusively operated for such purpose but was engaged in the manufacture and sale of the cones for profit as a competitive business. We think that upon the stipulated facts adopted by the Tax Court there was a rational basis for its conclusion. See Dobson v. Com'r, 320 U.S. 489, 501, 64 S.Ct. 239, 88 L.Ed. 248, and the cases there cited. The taxpayer was a foundation without members or stockholders whose activities were directed by high placed trustees who received only a nominal return for their services. It is clear that ceramic engineering is widely recognized as a subject of research. It is regarded as an applied science in fifteen institutions of higher education in the United States and Canada, and most of these grant degrees in the field. In several institutions the ceramics art is recognized as a fine art and in others there is research in the field of ceramics. Whether considered from the viewpoint of Sec. 1141, Title 26 U.S.C.A. as amended by the Act of June 25, 1948, or from the

more limited right of review established in Dobson v. Com'r, supra, we think that under either limitation the conclusion of the Tax Court is justified.

The record is replete with references to Orton's interest in the basic study of ceramics and to the fact that almost all of his mature life had been devoted to that interest. It is true that in his will he stated that the "principal purpose" was to provide a suitable organization for the manufacture and sale of high quality cones but in a following part of the will he stated it was his intention to provide an organization not for profit "whose real or ultimate objects are altruistic and devoted to producing industrial, scientific and social betterments without any personal or private gain. * * *" It seems obvious that he considered the plant the source of income for the promotion of research and studies in that field. It seems equally true that because of their peculiar importance to ceramic firing, he considered the provision of a permanent source of fine, standardized cones as fundamental to the advancement of the ceramic industry in this country. Actually, we think the first and ultimate purposes merge, and that the Tax Court discerned this.

■ A business does not operate in vacuo—it is related to some objective. With the ordinary business man, it is run for profit and the profits serve his needs. Here the business, which in itself Orton deemed basic for good ceramics, produced profits to be plowed back into the furtherance of research and study in that field. We think that the Commissioner's contention that the taxpayer was engaged in an active, competitive business for profit and that therefore the enterprise could not be considered as exclusively one for scientific or educational purposes is answered by the opinion in Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S.Ct. 204, 205, 68 L.Ed. 458, wherein the statute was construed. In that case the court said:

" * * * Two matters apparent on the face of the clause go far toward settling its meaning. First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and *yet*

*have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption.*

"*Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named,* and is intended to aid them when not conducted for private gain. *Such activities cannot be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit.* This is particularly true of many charitable, scientific and educational corporations * * *. *Making such properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the corporation is created and conducted. * * *"* (Italics ours.)

■ The fact that the agency is productive is not alone controlling. In Roche's Beach, Inc., v. Com'r, 2 Cir., 96 F.2d 776, 778, the court said:

"This does not mean that to come within the exemption a corporation may not conduct business activities for profit. The destination of the income is more significant than its source. * * *"

And it cited the Trinidad case and two cases from the Board of Tax Appeals, to wit: Sand Springs Home v. Com'r, 6 B.T.A. 198, 214; Appeal of Unity School of Christianity, 4 B.T.A. 61; see also Debs Memorial Radio Fund, Inc., v. Com'r, 2 Cir., 148 F.2d 948, 951; United States v. Pickwick Elec. Membership Corp., 6 Cir., 158 F.2d 272; Bohemian Gymnastic Ass'n Sokol of City of New York v. Higgins, 2 Cir., 147 F.2d 774.

We think that in the case before us the exemption clause of the statute should not be narrowly construed.

■ This brings us to the second question, whether the designation of some of the income of the Foundation in payments to Orton's widow was such that its net earnings inured to her benefit as a private individual within the meaning of the statute. We think that the Tax Court was correct in holding that they did not.

Perhaps the strongest authority for our conclusion is Lederer v. Stockton, 260 U.S.

3, 43 S.Ct. 5, 67 L.Ed. 99. In that case a hospital was residuary beneficiary of a testamentary trust, subject to certain annuities. All annuitants had died save one. The Supreme Court of Pennsylvania had held that the income could not be paid outright to the hospital until the death of all annuitants and until that event must remain in the control of the trustee. To meet this situation, the trustee loaned the residuary fund to the hospital, took a mortgage back and received sufficient funds from it, as interest on the mortgage loan, to pay charges and the remaining annuity. The income, which was many times the annuity, was held exempt from taxation under the clause in question here. Neither the Supreme Court nor the Circuit Court of Appeals were disturbed by the payment of the annuity, the question decided being, whether the income was received by the hospital, an exempt institution, or by the trustee, who was not.

Parcel II under Orton's will consisted of the residue of his estate after the devise to the Trustees of the Foundation. He directed that from this parcel his debts should be paid and certain devises and bequests made. He gave all the balance and residue thereof to his wife, "Mina Althea Orton, with the request *that she formally accept the same in lieu of and as full satisfaction of all dower rights and right to distributive share which she would have under the law, in order that the other provisions made herein may be carried out and particularly in order that the part of my property constituting Parcel One, as defined in this instrument, may pass into the Trust created to administer it, with absolute and undoubted title, and without disarrangement of the assets thereof."* (Italics ours.)

This provision is better understood when read in connection with another relating to the Foundation, from which it appears that in building the new plant and in creating the trust, the testator had severely depleted his estate and had taken from it its chief income-producing element, with the result that Parcel II would probably contain property of low income-producing value. Hence, he directed that the Executors as long as they should control the estate, and subsequently, the Board of Trustees controlling Parcel I, should pay to his widow from the earnings of the cone business the following sums over a period of five years, to wit:

"First year, twelve thousand dollars

"Second year, ten thousand dollars

"Third year, eight thousand dollars

"Fourth and fifth years respectively, six thousand dollars

"The total being forty-two thousand dollars."

However, when the Executors, of whom Mrs. Orton was one, came to wind up the estate, they found that business conditions had so deteriorated since the execution of the will and Orton's death, that the assets in Parcel II, largely real estate, were inadequate to pay the debts, much less to produce an income for the widow. It further appeared that the widow might, under the laws of Ohio, force the liquidation of the entire estate by claiming an undivided one-half interest in all the property of Orton, including that in Parcel I, namely, the property, business and goodwill of the Standard Pyrometric Cone Company, and that if she asserted that right it would be impossible to carry out the purpose of the testator in establishing the Foundation.

This threat to the creation of the Foundation was met by an agreement executed on December 5, 1933, between the Foundation, Mrs. Orton individually, and the Executors. By its terms Mrs. Orton elected to take under the will, which involved of course a renunciation of a half interest in Parcel I, and this she expressly did by "relinquishing, remising and quit-claiming to the said Foundation all interest therein. * * *" On its part the Foundation agreed to assume and pay certain claims against the estate in the sum of $21,679.65; to pay taxes and costs of administration in the amount of $26,552.53, and, so long as the Foundation was in debt by reason of the assumption of indebtedness or the refunding of borrowed money (which we shall discuss in a moment), to pay Mrs. Orton at the rate of $450.00 per month the $42,000 originally provided for her under the will; and after the $42,000 was paid, thereafter the sum of $350 per month for the remainder of her life. Of the $42,000

the agreement stated, "the same shall be paid to the spouse relict, or in the event of her death, to her estate, and the said Foundation agrees to make all the payments above specified * * * and the same are now, hereby, agreed upon and established as the general obligation of said trust estate."

In order to finance this arrangement, the Foundation agreed to mortgage the real estate in Parcel I for $28,000, Mrs. Orton to become surety on the note; and Mrs. Orton agreed to borrow the sum of $20,000 on her farm and loan it to the Foundation, for which the latter would execute its note to her. The sum of $17,000 was so borrowed by Mrs. Orton and the Foundation had repaid this amount by December 1939.

On December 5, 1933, in an appropriate action brought by the Trustees of the Foundation against Mrs. Orton and the executors and other proper parties, this contract was submitted to the Probate Court having jurisdiction and was approved by it, whereupon the executors transferred all the assets of the cone business to the Trustees of the Foundation and the business was established and has since been continuously operated by them as the Standard Pyrometric Cone Company. By July 15, 1940, the Foundation had paid the $42,000 to Mrs. Orton as originally provided by the will and began paying her the $350 per month provided for in the contract. Between 1934 and 1943 the Foundation had net profits of $135,564.59.

The $42,000 paid to Mrs. Orton was, by the terms of the will, a charge upon the estate; and by the contract this amount, together with the annuity of $350 a month, became a charge upon the Foundation. Mrs. Orton accepted the annuity "as a just and equitable consideration to the said spouse relict for her election to take under the will in order to confirm the said trust so established and for the doing of the other things contracted by her to be done." This contract was evidently made in good faith and we see no reason to dishonor it. We cannot say as a matter of law that it was executed to avoid taxation. Taplin v. Com'r, 6 Cir., 41 F.2d 454, 455. See also Emerit E. Baker, Inc., 40 B.T.A. 555.

We think that the case is distinguishable upon its facts from Scholarship Endowment Foundation v. Nicholas, 10 Cir., 106 F.2d 552; and Roger L. Putnam v. Com'r, 6 T.C. 702, relied upon by the Commissioner.

The amounts paid to Mrs. Orton were of course paid to her out of earnings of the Foundation but they were neither paid to nor received by her as such. They were neither paid nor intended to be paid to her as profits in the sense of dividends arising from operation. Such a course was specifically forbidden by the will itself. They were paid to her, as found by the Tax Court, upon ample evidence, to discharge the obligation of the Foundation to her under the contract, which the Probate Court found was for the best interest of the trust and necessary to its enforcement. Had it not been for the contract the Foundation could not have come into being and there would have been no earnings either "net" or otherwise. We think that the so-called profit-sharing provision of the will, hereinbefore referred to, indicates nothing beyond a desire on Orton's part to continue good employee relationships.

The decision of the Tax Court is affirmed.