**WILLIAM L. POWELL FOUNDATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 11169.

United States Court of Appeals
Seventh Circuit.

April 27, 1955.

Frank C. Olive, Indianapolis, Ind., Olive, Knox & O'Hara, Indianapolis, Ind., of counsel, for petitioner.

H. Brian Holland, Morton K. Rothschild, Asst. Attys. Gen., Ellis N. Slack, Robert N. Anderson, Sp. Assts. to the Atty. Gen., for respondent.

Before DUFFY, Chief Judge, and LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This case comes before us on a petition for review of the decision of the Tax Court of the United States,[1] entered on January 25, 1954, and involves a deficiency in income tax and delinquency penalty in the respective amounts of $341.06 and $85.27 for the taxable year ending January 31, 1950.

The first question presented is whether the Tax Court correctly decided that the taxpayer (petitioner) was not exempt from tax under Section 101(6) of the Internal Revenue Code of 1939,[2] relating to religious, charitable, and educational organizations.

The facts, as stipulated by the parties or found by the Tax Court from the evidence, are, with the exceptions hereinafter referred to, not in dispute. The taxpayer is an Indiana corporation and is located in Lebanon, Indiana. Its tax return for the year here involved (the taxpayer's fiscal year ending January 31, 1950), was filed with the Collector of Internal Revenue for the District of Indiana on December 4, 1950.

William L. Powell was a member of the Central Christian Church in Lebanon, Indiana. Desiring to make some gifts to the church, conferences were held with James C. Darnall, his close friend and business advisor, and the Board of the Church. Taxpayer corporation was thereupon organized and its articles of incorporation, at paragraph 2, provided as follows:

"The purposes for which said corporation is organized, are to promote religious, educational and charitable purposes, and in order to promote such purposes, to acquire by gift, devise, purchase or otherwise and to hold for investment or in trust, sell or dispose of any money, business, real estate, stocks, bonds or other securities or evidences of indebtedness created by any other corporation or corporations organized under the laws of the State of Indiana or any State in the United States and also all bonds or evidences of indebtedness of the United States or any county, State or mu-

nicipality therein, or any evidences of indebtedness of any person or persons, firm, partnership or association."

Taxpayer was organized on February 5, 1926, under an Indiana law concerning the organization of foundation or holding companies, for the purpose of promoting religious, educational and charitable purposes. It has no authorized capital stock.

The articles of incorporation also provided that the successors to the directors named in the articles "shall be elected by the official board of The Central Christian Church of Lebanon, Indiana, or by its successors, assigns or by the church or organization of which said church becomes a part." Directors were always so chosen, and Darnall was both an officer and member of the board of directors of the taxpayer from its incorporation to the date of trial of this case.

Shortly before his death in January, 1928, Powell gave to Darnall three United States liberty loan bonds with the request that they be delivered to the taxpayer. They were transferred to the taxpayer on January 23, 1928, together with the following instructions which had been written on the envelopes containing the bonds:

"Bond #39993 for $10,000.00

"I hereby request that the income from this Bond or the proceeds thereof shall be paid annually to my wife Ella P. Powell during her life time and at her death I request that one half of the annual income from this bond or its proceeds shall be used annually for religious, charitable or educational purposes and the other half of said annual income shall be added to the assets of William L. Powell Foundation.

"(Signed) W. L. Powell.

"Bond #39994 for $10,000.00

"I hereby request that this bond and the proceeds thereof be used as follows, that the principal of said bond or its proceeds be kept as a Permanent fund and that one half

of the interest on said bond or its proceeds be expended annually and the other half of said interest from said bond or its proceeds be added annually to the permanent fund. Said money to be expended in the United States.

"(Signed) William L. Powell.

"Bond #42532 for $5,000.00.

"The within bond is given by William L. Powell to the William L. Powell Foundation upon the following terms and conditions. The income from said bond or proceeds of same is to be paid to Mr. Powell during his life time and to his wife Ella P. Powell during her life time after which same become property of said Foundation.

"The same after the death of both Mr. and Mrs. Powell shall be used as follows: One-half of the income from said bond or the proceeds of said bond is to be used annually for religious, educational or benevolent purposes anywhere in the United States of America and one half of said income is to be added to the principal.

"The within bond is to be delivered to William L. Powell Foundation at the death of William L. Powell."

On or about January 25, 1928, the taxpayer converted bonds No. 39993 and No. 42532, in both of which Mrs. Powell had a beneficial interest, into bonds of like amount registered in the taxpayer's name. At the same time, bond No. 39994 was converted into a coupon bond. The three bonds earned 4¼% interest both before and after conversion. This amounted to $637.50 per annum on the two bonds totaling $15,000, the income from which was payable to Mrs. Powell. The taxpayer paid her the amount of $637.50 during each of its fiscal years ending January 31, 1929 to 1936, inclusive.

In 1935, when the United States bonds which Powell had donated to the taxpayer were maturing, a decision had to be

made as to whether or not the proceeds should be reinvested in new government bonds which were paying 3¼%. Darnall discussed the matter with Mrs. Powell, informing her of a substantial reduction in her income which would result from the purchase of new government bonds at that time. He suggested that the $15,000 be invested in real estate mortgages since the taxpayer was currently earning 5% and 6% on such mortgages. He stated that the decision as to how the proceeds of $15,000 of bonds were to be invested was being left up to her. She was hesitant about the transfer of the principal from government bonds to mortgages. She agreed, however, that the taxpayer should make this change after Darnall assured her that she could depend on receiving 5% on the $15,000. She was familiar with the professional reputation of Darnall as a loan agent and

abstractor, and knew that he personally passed on all mortgage loans made by the taxpayer. Darnall reported her wishes on this matter to the taxpayer's board of directors. They then set aside, on December 12, 1936, three mortgages aggregating $15,000 in a fund designated "Ella Powell Income Fund".

That was the only action taken by the Board about the $15,000, and thereafter the Board never authorized the segregation of any more mortgages to the "Ella Powell Income Fund." After the segregated mortgages were paid off, the proceeds became commingled with the other funds of petitioner.

Petitioner always had $15,000 of mortgages on hand that drew as much as 5%.

The following interest payments were received by the taxpayer on these three segregated mortgages during its fiscal years 1937 through 1942:

|  | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 |
|---|---|---|---|---|---|---|
| Bradshaw note | $ 36.16 | $149.25 | — | — | — | — |
| Riley note | 449.55 | 445.50 | $405 | $405.00 | 0 | $821.38 |
| Gill note | 259.20 | 189.27 | 0 | 207.26 | — | — |
| Total | 744.91 | 784.02 | 405 | 612.26 | 0 | 821.38 |

The taxpayer made the following payments to Ella P. Powell during those years:

| 1937 | 1938 | 1939 | 1940 | 1941 | 1942 |
|---|---|---|---|---|---|
| $697.18 | $839.95 | $750 | $800 | $750 | $787.50 |

The officers and directors served without compensation, except that the secretary and the treasurer received $200 and $100 in 1949 and 1950 respectively. Neither Darnall or any one else got any commissions for making loans.

After the year ending January 31, 1942, when the last of the three segregated mortgages placed in the "Ella Powell Income Fund" had been paid off,

the taxpayer no longer segregated any mortgages. The Ella P. Powell funds became merged and intermingled with the funds of the taxpayer. However, the taxpayer "made it a business" to keep $15,000 of mortgage loans on hand for Mrs. Powell. At times, it borrowed money from the bank to enable it to acquire mortgages currently available, but for which its own liquid funds were insufficient, because existing mortgages had not yet matured.

The taxpayer kept its books on a cash basis. The following schedule purports to show the taxpayer's net earnings for each of its fiscal years from January 31, 1936 to January 31, 1950, inclusive, together with the portion allocable to in-

terest on mortgage loans, the amounts of charitable contributions, and the pay- ments to Mrs. Powell for each of the years involved:

|      | Net Earnings | Interest Received on Mortgage Loans | Ella P. Powell Payments | Charitable Contributions |
|------|-------------|-------------------------------------|-------------------------|--------------------------|
| 1936 | $ 1,025.64  |             | $637.50 | $100.00 |
| 1937 | 554.86      | $ 891.16    | 697.18  | 425.00  |
| 1938 | 943.62      | 895.05      | 839.95  | 416.03  |
| 1939 | 1,483.81    | 699.90      | 750.00  | 185.41  |
| 1940 | 1,597.12    | 902.06      | 800.00  | 119.00  |
| 1941 | 1,409.17    | 608.60      | 750.00  | 207.90  |
| 1942 | 2,088.02    | 1,268.51    | 787.50  | 162.00  |
| 1943 | 2,513.61    | 957.11      | 750.00  | 70.75   |
| 1944 | 2,465.61    | 402.87      | 750.00  | 70.75   |
| 1945 | 2,118.13    | 970.16      | 750.00  | 856.78  |
| 1946 | 1,146.60    | 869.30      | 750.00  | 235.00  |
| 1947 | 2,458.64    | 1,250.10    | 750.00  | 160.00  |
| 1948 | 2,531.67    | 938.49      | 750.00  | 360.00  |
| 1949 | 15,467.01   | 1,147.14    | 750.00  | 500.00  |
| 1950 | 1,993.07    | 2,106.40    | 750.00  | 695.00  |

This schedule originated in the opinion of the Tax Court.[3]

On January 31, 1950 taxpayer held $41,555.92 in mortgages. None of them is identified on taxpayer's books as allocated to the widow's share.

No part of the activities of the taxpayer consisted of carrying on propaganda, or otherwise attempting to influence legislation.

On taxpayer's cash book, ever since the bonds were donated, payments to Mrs. Powell were designated as annuities, sometimes merely as "Ella P. Powell, $750."

Darnall made Mrs. Powell's income tax return for 1949 for her. Under Schedule "A", entitled "income from annuities or pensions," he stated as "cost of annuity" the sum of $28,500 and as "total amount

3. Petitioner's brief contains the following schedule which is at variance with the foregoing table, but which petitioner's counsel insists is supported by the evidence.

| Year | Net Income | Interest Received on Mortgage Loans | Payments to Mrs. Powell | Contributions |
|------|-----------|-------------------------------------|-------------------------|---------------|
| 1936 | $ 1,025.64 | $ 807.50  | $ 637.50  | $ 100.00  |
| 1937 | 554.86     | 644.37    | 697.18    | 425.00    |
| 1938 | 943.62     | 976.92    | 839.95    | 416.03    |
| 1939 | 1,483.81   | 1,384.79  | 750.00    | 185.41    |
| 1940 | 1,597.12   | 1,580.60  | 800.00    | 119.00    |
| 1941 | 1,409.17   | 1,181.28  | 750.00    | 207.90    |
| 1942 | 2,088.02   | 1,424.41  | 787.50    | 162.00    |
| 1943 | 2,513.61   | 961.15    | 750.00    | 70.75     |
| 1944 | 2,465.61   | 1,106.76  | 750.00    | 70.75     |
| 1945 | 2,118.13   | 1,639.32  | 750.00    | 856.78    |
| 1946 | 1,146.60   | 1,207.26  | 750.00    | 235.00    |
| 1947 | 2,458.64   | 1,252.60  | 750.00    | 160.00    |
| 1948 | 2,531.67   | 1,537.13  | 750.00    | 360.00    |
| 1949 | 15,467.01  | 1,147.14  | 750.00    | 500.00    |
| 1950 | 1,993.07   | 2,181.40  | 750.00    | 695.00    |
| Total | $39,796.58 | $19,032.63 | $11,262.13 | $4,563.62 |

received this year" the sum of $1,500. The $750 paid Mrs. Powell was included in the $1,500. Powell, during his lifetime, had paid $13,500 for annuities from other charitable institutions, and that amount, plus the $15,000, made up the total cost of $28,500. Darnall was not an expert on making tax returns. He filled out a few for personal friends. He did not think about reporting her income on a fiduciary form.

A claim for exemption under the provisions of § 101(6) of the Internal Revenue Code of 1939, supra, was filed by the taxpayer under date of May 18, 1948, on Form No. 1023 with the Commissioner of Internal Revenue. On October 12, 1948, the Commissioner advised the taxpayer that it was not entitled to exemption under § 101(6) of the Internal Revenue Code of 1939 and prior Revenue Acts, and reaffirmed his ruling on November 8, 1949.

The Tax Court decided that the taxpayer was not entitled to exemption as a religious and charitable foundation under § 101(6) because part of its net earnings inured to the benefit of a private individual, and that the taxpayer failed to show that its failure to file a return within the period required by statute was due to reasonable cause and not due to willful neglect. By its order the Tax Court fixed the tax deficiency and penalty as heretofore set forth.

In determining the statutory status of the taxpayer we should consider the essential facts which are ascertainable from the rather informal methods adopted by the donor of the trust as well as the methods of the taxpayer which, from the standpoint of a skilled accountant, lack complete clarity. The latter circumstance has led counsel and the Tax Court into difficulties in interpreting some of the allocations of receipts by the taxpayer as shown on its books.

A finding of fact by the Tax Court stated:

"From 1943 through 1950, the maximum amount of interest earned by petitioner on mortgage loans was 5 per cent. During this period petitioner paid to Ella P. Powell $750 per year, 5 per cent on $15,000, *without making any deductions for expenses involved in the various mortgage transactions.*" (Italics supplied.)

The italicized portion of this finding, which seems to assume such expenses were incurred, is without support in the record, since neither the stipulation or the evidence shows that there were any such expenses. At various times, if a good mortgage loan was offered, the taxpayer would borrow at the bank to buy the loan so that there would always be $15,000 of mortgage loans on hand. There is no evidence that the bank charged any interest on these advancements, or that any commission charges were incurred thereby.

The Tax Court found, as a fact, that "delinquencies in interest payments by mortgagors occasionally resulted in eventual losses of interest on mortgages held" by the taxpayer. We do not find that the record supports this finding. For instance, during the taxable year ending January 31, 1950, the taxpayer received no interest on four mortgage loans whose principal totaled $5,800. When, if ever, any delinquencies were written off as losses, as indicated by the finding of the Tax Court, does not appear. In fact the record is silent as to whether they ever grew into eventual losses.

We think that the record as a whole makes it apparent that taxpayer was organized with a predominantly charitable purpose in mind. The donor did, however, provide something for his wife during the remainder of her life, to be paid from a part of the fund which he set up. It is well established that when property is transferred to a charitable trust with a proviso that all or part of the income therefrom be paid to a private individual for a stated term, such payments are a charge upon the specific assets transferred, and the donee retains

its tax exempt status under § 101(6) of the Internal Revenue Code of 1939. Lederer v. Stockton, 260 U.S. 3, 43 S.Ct. 5, 67 L.Ed. 99; Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483; and Emerit E. Baker, Inc., 40 B.T.A. 555.

We think, also, that in this case everything that was done by the taxpayer was done in good faith and with the sole purpose of carrying out the charitable purposes of the donor and his desire to assist his widow to the extent indicated by him. The investment of the proceeds of the original bonds in real estate mortgages, so that the widow would receive a higher rate of income, was intended only to carry out what the parties felt the donor's wish would have been. Such investment did not defeat donor's charitable purpose. There is no indication of any intent to use the charitable corporation as a sham to procure an exemption under § 101(6), supra.

We hold that it was the donor's intent that his widow should receive the *gross* income from the original bonds, or the proceeds thereof. Taxpayer, it is true, in the later years failed to segregate the assets charged with the burden of producing income for the widow's benefit, and therefore, even from an examination of its books, it becomes difficult, if not impossible, to determine the actual income from those assets. However, it appears that taxpayer at all times had $15,000 worth of mortgage investments which were paying 5% interest, which is the rate of income the widow actually received from the taxpayer. Not only was it the donor's intent that the widow should receive the gross income from her share of the assets, but the donor gave to taxpayer a $10,000 bond with an unrestricted direction that one-half of the interest thereon be expended annually. The expenses, if any, of handling its investments could be paid by taxpayer from this interest. Moreover the record is devoid of any proof that expenses were incurred in the handling of the assets charged with payment of income to the widow.

It is apparent that taxpayer honestly attempted to pay her the amount to which she was entitled. The difference, if any, between the amount actually paid to her in the taxable year and the amounts actually received by the taxpayer in that year from the assets charged with payments for her benefit, is slight and might well be explained by the imperfect methods of bookkeeping used. There is no contention that, to pay income to the widow, taxpayer ever used any of the corpus of the trust.

If the evidence could be interpreted as showing that some part of the income from assets, other than the $15,000 mortgages held for the widow, was at times used to make up the $750 annual payments to the widow, it might also be urged on this record that these contributions were advancements which were repaid. No evidence is cited to show that the remainder of the trust suffered any eventual loss by such operations which would have merely bridged the gap caused by the alleged slowness of collection of interest on mortgages. If taxpayer paid the widow the interest on $15,000 of mortgages as it accrued, rather than when it was collected, temporarily borrowing from the remaining funds, that was within its discretion. Such a practice would not be inconsistent with the fact that taxpayer kept its books on a cash basis. The relationship of the parties and their informal methods would adequately explain the existence of such a practice.

We feel that § 101(6) should be construed in a reasonable manner. Its purpose, to exempt bona fide charitable corporations from tax, will best be carried out in this case by holding that taxpayer was not only organized and operated exclusively for religious and charitable purposes, but that no part of its net earnings inured to the benefit of any individual.

Hence we hold that the taxpayer for the taxable year ending January 31, 1950, was exempt from tax under § 101(6) of the Internal Revenue Code of 1939. It is therefore unnecessary to consider the government's contention that taxpayer

was subject to penalty [4] for willful failure to make and file a return. Accordingly the decision of the Tax Court of the United States entered on January 25, 1954, is reversed.