**Murray SEASONGOOD and Agnes Seasongood, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 12385.**

United States Court of Appeals
Sixth Circuit.

Dec. 14, 1955.

Murray Seasongood and James D. Long, Cincinnati, Ohio, for petitioners.

Karl Schmeidler, Washington, D. C., H. Brian Holland, Ellis N. Slack, Lee A. Jackson, Washington, D. C., on brief, for respondent.

Before SIMONS, Chief Judge, and Mc-ALLISTER and MILLER, Circuit Judges.

SIMONS, Chief Judge.

The petitioners are husband and wife and the present review involves the disallowance by the Commissioner of deductions taken in their individual income tax return for 1946 and 1947 and in their joint income tax returns for 1948 and 1949. The deductions taken by the taxpayers were for contributions made in the tax years to the Hamilton County Good Government League, which the petitioners contend were allowable under the provisions of §§ 23(o) (2) and 101(6) of the Internal Revenue Code of 1939, 26 U.S.C., 1952 ed.

At the hearing before the Tax Court, Seasongood was the only witness. No effort was made to impeach his oral testimony, though exhibits showing the League's financing and explaining its activities were made available. The Tax Court made detailed findings of fact and in its opinion, 22 T.C. 671, undertook to apply what, in its view, was the applicable law.

It said of Seasongood that he had been a lawyer, in active practice, for more than fifty years, had for many years a deep interest in matters relating to good government, with special reference to the government of his community, had taken an active part in civic matters pertaining to the health and general welfare of the people of Cincinnati and the efficient administration of the law in his county and state. He had been for two terms Mayor of Cincinnati, had a national reputation as an expert in municipal corporation law, was the author of a case book upon the subject widely used in law schools, and had lectured in many states on this subject and the subject of clean and efficient local government. He had served as a lecturer at the Harvard Law School, as a Professor of Law at the University of Cincinnati Law School and

as trustee, or in some other official capacity, in many organizations national in character and had engaged in charitable, educational and public welfare activity.

Of the League, it said that it was organized in 1934 and incorporated in 1941 as a corporation not for profit. Seasongood was its president from 1934 to 1945. The Articles and Constitution of the League specify its object to be "to provide an opportunity for discussion of matters of civic importance and to advance good government." The activities of the League during the tax years had been nonpartisan in the sense that it had not contributed to or affiliated itself with any political party. Its main activities were in operating the "Cincinnati Forum of the Air," to permit public discussion by individual citizens of matters affecting the citizen's welfare, the preparation and distribution, through schools and other organizations, of literature explaining the danger to the public health by the spread of disease by rodents and the best methods for their control, and the education of citizens of the community to the importance of exercising their right to vote, irrespective of party or candidates. It had been the practice of the League in each year to prepare and mail to its members and to distribute to the voting public through employers and others notices of the times of approaching elections, calling attention to the necessity of registration and the dates for registration. It urged all voters to register and exercise the right to vote as something due to themselves and to their community. The income of the League was small, being derived from dues and occasional contributions. Its statement of income and disbursements for the taxable year 1948 is typical of its financial activities during the years in question. In that year, it received dues and contributions in the total amount of $2,112.00 and its expenditures were $2,534.90.

Our consideration is directed to the question, whether the activities of the League characterized the contributions made to it by the taxpayers as contributions to a corporation operated exclusively for charitable or educational purposes. The Tax Court reasoned as follows: "The provisions of the applicable Sections 23(o) (2) and 101(6) recognized the fact that organizations formed for purely educational or charitable purposes may, in the course of their existence, as an instance of their activities, be forced to take part in some political activity. Only when such activities constitute a substantial part of their general activity is the relief provision of this section withheld. If, however, a substantial part of the organization's activities is political in character, as contrasted with activities purely religious, educational or charitable, it does not suffice to show that such activities were carried on with the highest motives and admittedly in the public interest. Efforts to convince the voters that certain candidates are best fitted for a public office or that certain legislation is for the public good are activities of a political nature. They do not qualify under the statute as educational."

The Tax Court conceded that the League was organized for and operated at all times unselfishly in the public interest, as such interest appeared to its members, and that the facts set out in its findings show that the greater portion of its activities falls within the category of charitable or educational ones. The reports of its committees for the years in question indicate very active and unselfish work by the members of the committees in investigating proposed legislation and making a study of necessary legislation to effect some public purpose. However, the League, on the recommendation of these committees, endorsed candidates for political office and sponsored or opposed legislation through contacts with the legislative authorities. These activities consisted largely, if not entirely, of personal effort and work on the part of the individual members of the committees and of the League and were not of a character to involve the expenditure of its funds. The League did not employ individuals for this work but on

the facts, as disclosed by the record, the Court was convinced that activities of this character constituted a substantial part of all of the activities of the League. Seasongood appears to have been the moving spirit in the League and it is understandable that his opinion of the League's work was that the activities treated as political were in the nature of educational work. His belief in this was further justified by the fact that over the past years he and his wife had made donations to the League and taken deductions for them on their returns, as allowable under § 23(o) and such deductions had not been questioned.

 This leads to consideration of the terms of § 23(o) (2), printed in the margin.[1] Since § 101(6) is identical with subdivision (2) of that section, it need not here be set forth. It will be observed that § 23(o) deals with deductions for individual contributions and gifts to corporations "operated exclusively for religious, charitable, scientific, literary, or educational purposes." Prior to 1934, the section did not include the language "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation," this being written into the law in the Revenue Act of 1934. It seems clear, therefore, in the light of the amended section, that the term "exclusively" is given a connotation differing from the ordinary meaning of that term, as originally used, and activities which are minor, and not substantial, do not disqualify charitable or educational corporations from the benefits of the exemp-

tion nor do they disqualify individual contributors to such corporations from deducting them in their income tax returns. The courts have so held. They have also applied the principle, that the section being remedial must be liberally construed. United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, 483; Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483; Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246; Huntington National Bank v. Commissioner, 13 T.C. 760; Weyl v. Commissioner, 2 Cir., 48 F.2d 811, 812; Cochran v. Commissioner, 4 Cir., 78 F.2d 176, 178; Liberty National Bank & Trust Co. v. United States, D.C.Ky., 122 F. Supp. 759. Indeed, the Tax Court in this case does not profess to depart from such doctrine but rests decision on its determination that certain of the League's activities were political in character, that such character inheres in propaganda and efforts to influence legislation, and that in this case such political activities were substantial. Seasongood's response to this is, in effect, that the League's activities were all essentially educational but if some are to be condemned as propaganda or attempts to influence legislation, because political, they were not substantial, since they engaged somewhat less than one-twentieth of the time and effort put forth in the public interest by the League or its officers and committees.

We pause to consider the meaning of the term "propaganda" and its connotation in the section involved. As stated in the Encyclopaedia Britannica, the word properly means an organization or

---

1. § 23. Deductions from gross income.
 "In computing net income there shall be allowed as deductions:

 \* \* \* \* \*

 "(o) [As amended by Section 224(a) of the Revenue Act of 1939, c. 247, 53 Stat. 862] Charitable and other contributions.

 "In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

 \* \* \* \* \*

 "(2) A corporation, trust, or community chest, fund, or foundation, created

or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; \* \* \*."

association for the spreading of particular beliefs or opinions. The Encyclopaedia Americana defines it as a synonym for any planned or concerted attempt to influence public opinion. In Webster's New International Dictionary (Second Edition), the primary meaning of the term is defined as any concerted group, effort, or movement to spread a particular doctrine or system of doctrines or principles. In Allen's American Glossary (1912), it is defined as a scheme for enlightening people concerning politics or other matters, and such connotation is traced to newspaper usage in America as early as 1800. So, it is the view of my colleagues in this case that Congress used the term with the above connotations in the section of the statute here involved. In this particular, however, I disagree with them, although it does not affect our unanimous conclusion on the ultimate decision of the case. Certainly, it cannot mean that all recommendations addressed to the public, or to legislative or administrative officials, comes within its scope. If so, then all representations or proposals designed to awaken public opinion or inform authority must have in them some quality of evil, since they are in effect condemned in a remedial statute, by excluding their proponents from its benefits, whether they are advanced in the public or private interest. It is my view that, as used in the statute, the term connotes public address with selfish or ulterior purpose and characterized by the coloring or distortion of facts. If all address to the public or to authority is to be condemned because propaganda, the right of petition characterized by John Quincy Adams as the right of "entreaty, supplication, prayer" becomes meaningless. So, also, with the constitutionally protected right of free speech. We may not shut our eyes to great international movements or fail to note that the term propaganda has in its more virulent form been characterized as the technique of the "Big Lie." Murray's Oxford University Source Dictionary notes a use of the word "propaganda" in an 1848 dictionary by Brande in which

it is said the name "propaganda" is applied, in modern political language, as a term of reproach to secret associations for the spread of opinions and principles which are viewed by most governments with horror and aversion." Webster's dictionary also has this subsidiary definition, "now, often, dissemination of ideas, information, gossip, or the like, for the purpose of helping or injuring a person, an institution, a cause, etc.; as, the victim of the opposing party's propaganda, * * *."

If this is the sense in which the term is used in the section herein involved, and I think it is, there is nothing in the findings of fact of the Tax Court which justifies the Commissioner in his determination, that the activities of the League were exerted for a selfish, unethical purpose, or is anywise lacking in good faith. Indeed, the findings and conclusions of the Tax Court negative such purposes. To brand such representations as were made by the League as "political" does not gainsay this observation.

And what is meant by "otherwise attempting to influence legislation"? The statute does not elucidate the phrase and no legislative history has been cited to throw light upon it. In one sense, nearly every effort made by individuals or organizations in the public interest and for the betterment of government necessarily, has as an indirect result at least, some influence on legislation. The Supreme Court in United States v. Harriss, 347 U.S. 612, 623, 74 S.Ct. 808, 815, 98 L.Ed. 989, in construing certain sections of the Antilobbying Act, 60 Stat. 812, 839, followed the established doctrine, that if a statute may reasonably be interpreted to avoid invalidity, such interpretation must be adopted, summarized the prerequisites to coverage. It classified them as: "(1) the 'person' must have solicited, collected or received contributions; (2) one of the main purposes of such 'person,' or one of the main purposes of such contributions, must have been to influence the passage or defeat of legislation by Congress; (3) the intended

method of accomplishing this purpose must have been through direct communication with members of Congress." So, here, the method of influencing legislation must be considered and there is nothing in the findings of fact that either challenges the validity, the good faith purpose, or any untoward result in the communications addressed by the League either to its members, public opinion generally, or to legislative or administrative officers. Nothing in the record indicates lobbying, influence peddling or illegal or unethical pressures upon legislators. Little is disclosed other than letters to the Governor and an appearance before a legislative committee.

In any event, whether the term "propaganda" was used in the statute in the sense in which my colleagues consider that Congress intended it, or in the sense in which I find was contemplated, we still think the Commissioner's determination erroneous. Seasongood testified that something less than 5% of the time and effort of the League was devoted to the activities that the Tax Court found to be "political." In view of the rule, that this remedial statute must be liberally construed to effect its purpose, and in view of the fact that Seasongood's evidence was not successfully challenged either by adversary witnesses or destructive analysis, we conclude that the so-called "political activities" of the League were not in relation to all of its other activities *substantial*, within the meaning of the section.

We do not find Better Business Bureau of Washington, Inc. v. United States, 326 U.S. 279, 66 S.Ct. 112, 114, 90 L.Ed. 67, to compel a contrary result. There, Mr. Justice Murphy found it unnecessary to determine the correctness of the educational characterization of petitioner's operations, "it being apparent beyond dispute that an important if not the primary pursuit of petitioner's organization is to promote not only an ethical but also a profitable business community."

Since this view requires that the Tax Court's decision must be reversed, we find no occasion to consider the petitioner's contentions based upon Section 23 (a) (1) (A) of the Internal Revenue Code of 1939, that his contributions constituted a deductible business expense.

Reversed and remanded to the Tax Court for further proceedings consistent herewith.