247 F.2d 431
 LICHTER FOUNDATION, Inc., Appellant,
v.
Russell A. WELCH, Appellee.
SOUTHERN FIREPROOFING COMPANY, Inc., Appellant,
v.
UNITED STATES of America, Appellee.
Jacob LICHTER and Jennie L. Lichter, Appellants,
v.
UNITED STATES of America, Appellee.
 Nos. 13000-13002.
 United States Court of Appeals Sixth Circuit.
 August 30, 1957.
 
 Paul W. Steer, Cincinnati, Ohio, Charles H. Tobias, Jr. and Steer, Strauss & Adair, Cincinnati, Ohio, on brief, for appellants.
 Marvin W. Weinstein, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attorneys, Washington, D. C., Hugh K. Martin, U. S. Atty., Cincinnati, Ohio, on brief, for appellees.
 Before ALLEN, McALLISTER and MILLER, Circuit Judges.
 MILLER, Circuit Judge.
 
 
 1
 The appellants, Lichter Foundation, Inc., Southern Fireproofing Company, Inc., and Jacob Lichter and Jennie L. Lichter, his wife, filed separate actions in the District Court to recover federal income taxes and interest claimed by them to have been overpaid for the fiscal years ending August 31, 1949, 1950 and 1951. The main question involved is whether Lichter Foundation, Inc., is exempt from taxation under Section 101(6) Internal Revenue Code 1939, 26 U.S.C.A. § 101(6).
 
 
 2
 The District Judge, in dismissing the actions filed detailed Findings of Fact, of which the following are sufficient to present the issue.
 
 
 3
 Jacob Lichter, age 58, had been in the masonry contracting business since 1923, operating through a partnership known as Southern Fireproofing Company and through a corporation known as Southern Fireproofing Company, Inc., of which he was president. He engaged in several civic activities and, because of his own experience in earning his way through school, early developed an interest in aiding needy students. In 1945 he and his wife provided by their wills two trusts to aid needy students. However, from 1945 to 1947 Lichter was more successful in business than he expected to be and he felt that it would be a good thing if he saw an opportunity to do so, to effectuate the purpose of these trusts during his lifetime rather than after his death. He consulted his attorney for advice on the possibility of establishing a foundation to aid needy students. After discussing the matter with his attorney, he developed the idea that the first job that came along that was of a sizeable nature and looked as though he might make a reasonable profit off of it would be used for a foundation, which he would incorporate at that time.
 
 
 4
 About February, 1948, the Ring Construction Corporation of Minneapolis, Minnesota, general contractors, submitted a bid for the construction of a Veterans' Hospital at Albany, New York, and was awarded the contract in the latter part of March, 1948. Lichter, operating through his partnership or corporation, had done masonry subcontracting work for Ring Construction Corporation off and on since 1934. He communicated with Morris J. Ring, president of the construction corporation, about performing the masonry work in the construction of the Veterans' Hospital. Lichter had an efficient organization which could accomplish the job and Ring felt that Lichter could do the job better than anyone else he knew. He wanted the services of both Lichter and his Southern Fireproofing Company staff.
 
 
 5
 Following negotiations, which included discussion of a union rule which prohibited the sub-contracting of masonry work in the usual manner, they decided to use what was known as a "management contract," rather than a sub-contract. As a practical matter, there was no substantial difference between the management contract and the ordinary sub-contract. It required Lichter to furnish all necessary engineering services, to purchase all necessary materials, and to employ and supervise all necessary labor for the construction of all masonry work on the hospital. Although the Southern Fireproofing Company could have taken the management contract, Lichter proposed that it be taken in the name of the Lichter Foundation, Inc., which fitted in with his idea of starting during his lifetime a foundation to help needy students. He thought that the Veterans' Hospital contract was the proper one with which to start the foundation because he estimated that he would make a substantial amount of money if he were successful on the job, which would be enough to justify establishing a foundation. Ring knew nothing about Lichter Foundation, Inc., which had not been incorporated, or its ability to perform the job, but it made no difference to him who actually took the contract as long as he was sure that Lichter and his staff would perform the work. The contract contained the personal guaranty of Jacob and Jennie Lichter, individually, and as partners in the Southern Fireproofing Company, that the contract would be performed, which guaranty was secured by the deposit in escrow with a bank of $100,000 in securities. On August 27, 1948, Ring Construction Corporation as "contractor" and Lichter Foundation, Inc., a corporation to be formed under the laws of the state of Ohio, as "manager," entered into the management contract.
 
 
 6
 On September 7, 1948, Lichter Foundation, Inc., was organized as a corporation, not for profit, under the laws of the state of Ohio. The Articles of Incorporation stated that the purpose for which the corporation was formed was to handle, invest and administer "funds coming into its hands to aid needy students, and to pay such funds for the purpose of rendering aid to such students who desire to pursue courses of study leading to a degree from the Massachusetts Institute of Technology, or from a college, university or other recognized institution of higher education, said aid to be rendered to such students as designated hereinafter, and said aid to be in such amounts and to be rendered under such terms and conditions as may be determined by the Board of Trustees from time to time, * * *. The purpose of said corporation shall also be to render aid and assistance for other educational, scientific or charitable purposes, and to pay funds therefor as in the opinion of the Board of Trustees may be advisable from time to time."
 
 
 7
 Lichter Foundation, Inc., under the personal supervision of Lichter, performed the management contract using the staff which normally worked for Southern Fireproofing Company. The Foundation advanced the money necessary to meet payrolls and purchase materials, and was periodically reimbursed by Ring. Performance of the contract was completed on January 4, 1951. The Foundation made a net profit on the contract for the fiscal years ending August 31, 1949, 1950 and 1951 of $200,501.05, $140,418.73 and $182,689.47, respectively, for a total of $523,609.25. From the time of its organization through August 31, 1951, the Foundation's only other income consisted of contributions, interest and dividends totaling $83,323.91. During the same period, the Foundation's only expenditures, other than those directly or indirectly related to performance of the contract, including insurance, office supplies, contributions and student loans, totaled $17,552.11.
 
 
 8
 The three Lichter organizations (Southern Fireproofing Company, Southern Fireproofing Company, Inc., and Lichter Foundation, Inc.) shared the same offices. So far as the accounting was concerned, all of the employees were employees of the Southern Fireproofing Company, Inc. At the end of each year, office overhead was allocated among the organizations in proportion to the amount of business done by each entity during the year. The Foundation's pro rata share of overhead expenses for the three years in question was $16,330.87, $26,454.02 and $3,857.07, respectively. Lichter drew an annual salary of $20,000, included in the total overhead, a pro rata share of which was paid by the Foundation as set out above.
 
 
 9
 The Foundation applied for, but was denied, tax-exempt status for its income for years prior to the fiscal year ending August 31, 1951, but has been granted tax-exempt status for subsequent fiscal years. As a result of the denial of a tax-exempt status, it paid federal income taxes and interest in the amounts of $91,081.60, $61,796.36 and $88,355.22 for the respective years involved.
 
 
 10
 Jacob and Jennie Lichter contributed to the Foundation $19,500 in 1948 and $23,250 in 1950. Southern Fireproofing Company, Inc., contributed to the Foundation $350 in 1949. These parties paid federal income tax and interest deficiencies as a result of the disallowance of the amounts contributed by them to the Foundation, as deductions for the years in which they were paid.
 
 
 11
 The three taxpayers filed timely claims for refund for the taxes and interest paid. They contended that Lichter Foundation, Inc., was organized and operated exclusively for charitable or educational purposes, within the meaning of Section 101(6) of the Internal Revenue Code of 1939 during the fiscal years ending August 31, 1949, 1950 and 1951. Jacob and Jennie Lichter and Southern Fireproofing Company, Inc., claimed that their contributions to the Foundation were proper deductions under Section 23(o) and (q) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(o, q), in that they were made to and for the use of a foundation organized and operated exclusively for charitable purposes. Failing to obtain refunds, the present actions were filed by them. They were consolidated for trial in the District Court, and following the trial were dismissed by the District Judge. These consolidated appeals followed.
 
 
 12
 Section 101(6) exempts from income taxation corporations and any "foundation, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." The ultimate issue presented in these cases is whether the Lichter Foundation, whose income under its charter provisions was to be used for charitable purposes, was exempt from income taxation for the taxable years in question despite the fact that its income was derived chiefly from profits from business operations.
 
 
 13
 The appellees contend that the Foundation was not entitled to the tax-exempt status because one of the purposes for which it was organized and operated was to engage in competitive business operations, which necessarily meant that it was not organized and operated "exclusively" for charitable or educational purposes, as required by the statute. Better Business Bureau of Washington, D. C. v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67.
 
 
 14
 The appellants argue that such a contention fails to distinguish between the activities of the corporation and the purposes of the corporation, that the wording of the statute itself makes a distinction between the charitable or educational "purposes" of the organization and its "activities," and that since the purposes of the corporation are exclusively charitable or educational the requirements of the statute are complied with. They point out that charitable and educational organizations can not carry out their charitable and educational purposes without money and that making their properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the organization was created and conducted. Trinidad v. Sagrada Orden, 263 U.S. 578, 581, 44 S.Ct. 204, 205, 68 L.Ed. 458. They contend that it is immaterial whether the properties are made productive by being invested in land or securities or by being used in some other income returning operation so long as the income derived therefrom is used exclusively for the charitable or educational purposes of the organization.
 
 
 15
 Our construction of the statute starts with the Trinidad case, supra, decided in 1924. In that case, the Supreme Court held that a corporation sole, organized and operated in the Philippine Islands for religious, benevolent, scientific and educational purposes, was not taxable on income used exclusively for those purposes. The corporation's income was derived mainly from rents, dividends and interest. A relatively small part of its income came from profits from occasional sales of wine, chocolate and other articles purchased and supplied for use in its churches, schools and other agencies. In holding the corporation exempt, the Supreme Court said the following about the statute, "First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and yet have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption." It pointed out that making property owned by the corporation productive to the end that the income may be used for its charitable purposes did not alter or enlarge the purposes for which the corporation was created and conducted. It also referred to the fact that the transactions in wine, chocolate and other articles did not amount to engaging in trade in any proper sense of the term, in that there was no selling to the public or in competition with others. It said, "That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed." Irrespective of the exact factual situation in the Trinidad case, the Court's statement that the statute says nothing about the source of the income but makes the destination the ultimate test of exemption, has furnished the basis for what is known as the Destination Test, thereafter adopted by the Court of Appeals for the Second Circuit in 1938 in Roche's Beach, Inc., v. Commissioner, 96 F.2d 776, 778, and other cases hereinafter referred to. In the Roche's Beach case, the corporation operated a bathing beach business from which it obtained substantial income which was used for charitable purposes. In holding the corporation exempt from taxation, the Court said that the statute did not mean "that to come within the exemption a corporation may not conduct business activities for profit. The destination of the income is more significant than its source," citing Trinidad v. Sagrada Orden, supra. Certiorari was not applied for and this ruling was accepted and followed by the Commissioner for several years. The ruling was subsequently approved by the same court in Bohemian Gymnastic Ass'n Sokol of City of New York v. Higgins, 2 Cir., 147 F.2d 774, 776; Debs Memorial Radio Fund, Inc., v. Commissioner, 2 Cir., 148 F.2d 948, 951-952.
 
 
 16
 The ruling was followed and approved by this Court in Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483, 486. It has also been approved in the following cases: Willingham v. Home Oil Mill, 5 Cir., 181 F.2d 9, 10; Scofield v. Rio Farms, Inc., 5 Cir., 205 F.2d 68, 72; C. F. Mueller Co. v. Commissioner, 3 Cir., 190 F.2d 120, 121; Boman v. Commissioner, 8 Cir., 240 F.2d 767, 770 771. See also: Squire v. Students Book Corp., 9 Cir., 191 F.2d 1018, 1020; Koon Kreek Klub v. Thomas, 5 Cir., 108 F.2d 616; United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, 484; Estate of Simpson v. Commissioner, 2 T.C. 963, 966.
 
 
 17
 After recognizing and following the ruling in Roche's Beach case for several years, the Commissioner in 1942 announced that he did not intend to continue to follow it. Thereafter, the problem of organizations operating commercial businesses in competition with others and claiming exemption solely because their profits were to be devoted to charity was presented to Congress. The Ways and Means Committee of the House spoke as follows in making its report, "These organizations were originally given this tax exemption on the theory that they were not operated for profit, and that none of their proceeds inured to the benefit of shareholders. However, many of these organizations are now engaged in operation of apartment houses, office buildings, and other businesses which directly compete with individuals and corporations required to pay taxes on income derived from like operations. Your committee was without sufficient data to act intelligently, since many of these corporations and organizations are not now required to file reports, and in the absence of such information it was felt best to continue the present tax exemption, but to require them to file reports stating specifically the items of gross income, receipts, and disbursements and such other information, and keep such records, as the Commissioner of Internal Revenue may prescribe.
 
 
 18
 "These returns, under the bill, are required to be made for the taxable years beginning after December 31, 1942, and all subsequent years, and it is the intent of your committee to make a thorough study of the information contained in such returns with the view to closing this existing loophole and requiring the payment of tax, and the protection of legitimate companies against this unfair competitive situation." H. Rep. No. 871, 78th Cong.; 1st Sess., pp. 24-25. It will be noticed that the report specifically stated that it was considered best "to continue the present tax exemption" and later, after a thorough study of the problem it was its intent to close "this existing loophole" and require payment of tax. This appears to be a recognition by the Committee that under the statute as it then existed such a corporation was tax exempt. It was not until the Revenue Act of 1950 that Congress made a change which expressly imposed a tax on what it called the "[u]nrelated business net income" of organizations exempt from tax under Section 101. Section 301 of the Revenue Act of 1950; Sections 421, 422, Internal Revenue Code, 1939, 26 U.S.C.A. §§ 421, 422. In the meantime, this Court on March 28, 1949, ruled in favor of tax exemption in Commissioner of Internal Revenue v. Orton, supra, 6 Cir., 173 F.2d 483, 486, quoting that portion of the opinion of the Supreme Court which said that the statute "says nothing about the source of the income, but makes the destination the ultimate test of exemption" and also the statement in the opinion in the Roche's Beach case, "This does not mean that to come within the exemption a corporation may not conduct business activities for profit. The destination of the income is more significant than its source." Certiorari was not applied for in the case. We have recently cited the case with approval of its holding that Section 101(6) Internal Revenue Code 1939, "being remedial must be liberally construed." Seasongood v. Commissioner, 6 Cir., 227 F.2d 907, 910. The District Judge in making his ruling in the present case did not refer to either the Orton case or the Roche's Beach case which it followed.
 
 
 19
 Other courts, under varying factual situations, have heeded the Commissioner's contentions and held such organizations taxable. Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451, certiorari denied, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623; United States v. Community Services, 4 Cir., 189 F.2d 421, certiorari denied, 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694; Ralph H. Eaton Foundation v. Commissioner, 9 Cir., 219 F.2d 527; John Danz Charitable Trust v. Commissioner, 9 Cir., 231 F.2d 673, certiorari denied, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50; Riker v. Commissioner, 9 Cir., 244 F.2d 220. However, it is to be noted that the earliest of these cases was decided in 1950, subsequent to the organization of the Lichter Foundation and its execution of the masonry contract in 1948, at which time the rule of the Roche's Beach case was the judicially approved rule. The ruling in the Universal Oil Products Co. case seems to be based largely upon the court's finding (181 F.2d at pages 464-465) that "the scientific or educational purpose of plaintiff's operation instead of being exclusive was only incidental to the primary purpose of research, development and securing patents in the petroleum field for the benefit of the petroleum industry and particularly for the major oil companies, in order to improve their business, increase their sales and thereby secure to them greater profits. Resulting benefits to the public were only incidental," citing Better Business Bureau of Washington, D. C. v. United States, supra, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67. A similar view was expressed by the same court in its earlier case of Underwriters' Laboratories v. Commissioner, 7 Cir., 135 F.2d 371, 373, certiorari denied, 320 U.S. 756, 64 S.Ct. 63, 88 L.Ed. 450. And in the Ralph H. Eaton Foundation case, the Court was faced with the necessity of differing with its ruling of a few years previous in Squire v. Students Book Corporation, supra, 9 Cir., 191 F.2d 1018, justifying the difference on the basis of the different factual situations involved. It shortly thereafter followed this later ruling in the John Danz Charitable Trust Co. case and the Riker case, cited above. The numerous cases involving the issue, with their conflicting rulings, are referred to and discussed in the opinions in the Universal Oil Products Co. case and the Community Services case, making it unnecessary to repeat the discussion here.
 
 
 20
 In view of the foregoing judicial, administrative and legislative construction of Section 101(6), we do not think that for the purposes of this case we should apply a different rule from that stated in the Roche's Beach case, which was the judicially approved rule when the Lichter Foundation was organized, and which was subsequently approved by this Court in Commissioner of Internal Revenue v. Orton, supra, 173 F.2d 483. While recognizing the merit of the Commissioner's argument in support of the new rule, which has received some judicial approval, particularly in the Fourth and Ninth Circuits, it appears that the rule in the Roche's Beach case still has the judicial approval of the Second, Third, Fifth, Sixth and Eighth Circuits with respect to taxable years prior to January 1, 1951. Any change in the rule in this Circuit should be by statute rather than by judicial decision. New York Life Ins. Co. v. Ross, 6 Cir., 30 F.2d 80, 83, certiorari denied, 279 U.S. 852, 49 S.Ct. 348, 73 L.Ed. 995; Rd-Dr. Corporation v. Smith, 5 Cir., 183 F.2d 562, 565, certiorari denied, 340 U.S. 853, 71 S.Ct. 80, 95 L.Ed. 625. That change has now been made, but applicable by the terms of the statute only to taxable years beginning after December 31, 1950. It does not apply to the present litigation. In our opinion, the Lichter Foundation was exempt from income taxation under Section 101(6), Internal Revenue Code 1939, for the years in question. Jacob and Jennie L. Lichter and the Southern Fireproofing Company, Inc. are entitled to income tax deductions for the contributions made by them to the Foundation, under the provisions of Section 23(o) and (q) of the Code.
 
 
 21
 The judgments are reversed and the cases remanded to the District Court for further proceedings consistent with the views expressed herein.