**HURON CLINIC FOUNDATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. No. 1284.**

United States District Court
D. South Dakota, S. D.

Dec. 21, 1962.

Paul G. Zerby, of Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., and Raymond E. Dana, Sioux Falls, S. D., for plaintiff.

Harold C. Doyle, U. S. Atty., and Travis H. Lewin, Asst. U. S. Atty., Sioux Falls, S. D., and Louis F. Oberdorfer, Asst. Atty. Gen., and Edward S. Smith, Jerome Fink and Joyle C. Dahl, attorneys, Department of Justice, Washington, D. C., for defendant.

BECK, District Judge.

The Huron Clinic Foundation, hereinafter referred to as the taxpayer, is in this action pursuant to the provisions of Title 28 U.S.C.A. § 1346(a) (1), seeking to recover income taxes and interest thereon, alleged to have been erroneously and illegally assessed and collected by the District Director of the Internal Revenue in and for the District of South Dakota, for the tax years of 1954 through 1956.

As a basis for that claim, it is its position that its Articles of Incorporation [1]

1. "ARTICLES OF INCORPORATION OF THE HURON CLINIC FOUNDATION: KNOW ALL MEN BY THESE PRESENTS: That we, the undersigned, J. C. Shirley, W. H. Saxton, B. T. Lenz, H. L. Saylor, Max Royhl and W. L. Darling, for ourselves, our associates and successors, have associated ourselves together for the purpose of forming a corporation under and by virtue of the Stat-

are conclusive on the point that it during those years had exemption status for income tax purposes under Section 501(c)(3), Internal Revenue Code of 1954, which lists:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence

utes and Laws of the State of South Dakota, and we do hereby certify and declare as follows, viz:

"1. The name of this corporation shall be The Huron Clinic Foundation.

"2. This corporation is organized and shall be operated exclusively for charitable, scientific and educational purposes, including, among other things, the aid of the sick and disabled, the study of the causes, characteristics, prevention and cure of human ailments and injuries, and problems of general public hygiene and health, and the promotion of medical, surgical and scientific research, knowledge, skill and education.

"3. The place where the principal business of this corporation shall be transacted is the City of Huron, in the County of Beadle, State of South Dakota.

"4. The term for which this corporation shall exist shall be perpetual.

"5. The number of directors who are to conduct the business of this corporation until its first annual meeting in 1947 shall be six, and the number of such directors during subsequent years shall be not less than five nor more than eleven, as may be determined at their annual meeting. Until the annual meeting of the members in 1947 and until their successors shall be the elected the following persons shall be directors, to-wit: J. C. Shirley, W. H. Sexton, B. T. Lenz, H. L. Saylor, Max Royhl and W. L. Darling, the residence of each of which is Huron, South Dakota.

"6. The plan of operation of this corporation shall be to receive, by purchase, gift, devise, bequest or otherwise, either from its members or others, real or personal property of any nature; to hold, use, improve, operate, manage, lease, sell, convey, pledge, mortgage, invest and dispose of any such property; to borrow money for the improvement of any of such property; and to mortgage any such property to secure any debts so incurred. All net income from any such property and all the proceeds of any disposition thereof, and all net earnings and income of the corporation, shall be used exclusively for the promotion of its charitable scientific and educational purposes. The corporation may do and perform generally and anywhere any and all acts and things reasonably incidental to its purposes herein set forth; provided that no part of the activities of this corporation shall be the carrying on of propaganda or otherwise attempting to influence legislation, or the practice of medicine or surgery. No part of the property, net earnings, or net income of this corporation shall ever inure to the benefit of any private shareholder, member or individual.

"7. This corporation shall have no capital stock. The undersigned incorporators shall constitute the original members thereof. Additional persons may be admitted to membership upon application approved by resolution of the board of directors. Yearly contributions may be required from members, not exceeding $10.00 per year, as may be determined from time to time by the directors. The membership of any member or members may be terminated with or without cause by resignation filed with the secretary of the corporation, or by resolution adopted by the affirmative votes of at least three-fourths of the board of directors.

"8. In the event of the dissolution of this corporation, all of its assets shall, after the payment of its obligations, be conveyed, paid over and delivered to the University of South Dakota for the use and benefit of its College of Medicine.

"9. This corporation shall not be subject to any grand, supreme or sovereign lodge or other superior body or bodies and the amount of property which it may hold is fixed at Two Million Dollars ($2,000,000.00).

"10. The private property of its members shall not be liable for its corporate debts.

"IN TESTIMONY WHEREOF, We have hereunto set our hands this 26th day of December, 1945, in the City of Huron, County of Beadle, State of South Dakota."

This document is signed by the associates and acknowleged.

# 850

legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

■ Generally, in order to sustain such a claim it is for the taxpayer to prove: "(1) that it was organized exclusively for charitable purposes, (2) that it is operated exclusively for charitable purposes, (3) that no part of its net earnings inured to the benefit of any private shareholder or individual, and (4) that no substantial part of its activities consist of carrying on propaganda or otherwise attempting to influence legislation. * * *" Duffy v. Birmingham, 8 Cir., 190 F.2d 738 (1951) and Boman v. Commissioner of Internal Revenue, 8 Cir., 240 F.2d 767 (1957). But with (1) and (4) excluded as controversial under the stipulation between the parties and the Government's admission, the court need only resolve the disputed questions raised by (2) and (3).

The facts bearing on those two and settled by the stipulation may be summarized as follows: that the taxpayer on December 27, 1945, was organized and incorporated under the laws of South Dakota, as a nonprofit, nonstock eleemosynary corporation; that its stated purpose was to operate exclusively as specified in its Articles of Incorporation; that the Huron Clinic, on December 31, 1945, was organized as an Association, under the laws of the State of South Dakota for the purposes referred to in its Articles of Incorporation;[2] that the Clinic

2. Excerpts from the Articles of Association of the Huron Clinic: "This AGREEMENT, made this 31 day of Dec., 1945, by and between J. C. Shirley, W. H. Saxton, H. L. Saylor, B. T. Lenz, and H. P. Adams, all of Huron, Beadle County, South Dakota, WITNESSETH:

"WHEREAS, A group of five physicians and surgeons organized the Huron Clinic on March 15, 1922. Their purpose was to engage in the practice of medicine and surgery and allied branches of that practice. It was their experience and belief that because the practice of medicine and surgery and its various branches covered so extensive a field and called for specialization that the best in service and care could only be attained by such practice as a group, and because thereby and thereby only the combined skills and experiences of the members of the group could be brought to bear on individual cases, and thus the maximum assurance of adequate treatment could be obtained. From time to time changes occurred in the membership of the group. At the present time three members of the original group are still engaged in the practice of medicine and surgery with the group.

"WHEREAS, The judgment of the founders of the group known as the Huron Clinic has in the opinion of those presently associated therewith been vindicated because it has through the operation of the group throughout the years been possible to obtain the cooperation of each of the members thereof for the purposes of consultation, the acquisition of needed and valuable equipment, the retention of the services of others in specialized fields and through the consequent advancement of the profession and its standards all without disadvantage through excessive fees to those who have availed themselves of the services of the Huron Clinic.

"WHEREAS, It was the conception of the founders of the Clinic, and now is and long has been the conception of those who are parties to this agreement, that the Huron Clinic should be of service to humanity in its broadest sense and not the material advancement or enrichment of the individual members of the group, that only such part of the earnings of the Huron Clinic as is reasonably necessary to compensate them for their services should inure to the benefit of the members of the group, and that the rest of the earnings should be used for the benefit of the public from whom such earnings have come and will come through better care of the sick, medical education for better trained doctors, research and the general welfare of the public. It is the present belief of the parties to this agreement that their conception may be better served by the ultimate transfer of all of the Huron Clinic property and equipment together with the funds, to which reference has been made to a medical school or to a university or college maintaining a medical school. To the end that the work of the Huron Clinic may be carried on successfully and efficiently, its continuity assured, its patients assured of the best in treatment

thereafter sold its professional equipment and other assets to the taxpayer at a price equal to their depreciated cost with donations from its members of $20,000 in cash and other assets, and that the taxpayer in April 1949 completed the construction of a building in Huron at a total cost of $233,868.67, partially financed by a $100,000 real estate mortgage, which by December 31, 1953, had been reduced to $50,657.33.

Further summarization, shows the building to have been constructed for the Clinic and leased to it by the taxpayer under a formula set forth in the Clinic's Articles of Incorporation, whereby its gross receipts, less expenses, taxes and donations for civic, philanthropic and public purposes, were to be paid to the taxpayer as rent, with payments from the Clinic to the taxpayer under that arrangement of $41,857.79 for 1946 and for each of the next seven years through 1953, $50,314.60, $19,828.08, $34,454.63, $36,351.99, $19,351.99, $35,888.60 and $30,021.89.

It is also stipulated that the Commissioner's ruling on February 28, 1947 for tax exemption status to the taxpayer under Section 101(6) Internal Revenue Code of 1939, was revoked as he ruled otherwise on November 16, 1953 as to 1954 and subsequent years, with retroactive effect on taxes for prior years explicitly excluded.

Also settled and agreed on is the fact that the Commissioner upon audit of the Clinic's return for the years 1946, 1947 and 1950 through 1952, in part denied the deductions it claimed by reason of the rent formula payments for the years 1946, 1947, 1950 and 1952, that he then disallowed the balance of the payments to the taxpayer in the amount of $80,000 and that the end result are those specified in paragraph XIII of the Stipulation [3].

The stipulation shows the taxpayer to have complied with the requirement to file returns for the three tax years in question, power in the Board of Governors of the Clinic, with the advice and consent of the taxpayer, to fix salaries of the associate doctors at the Clinic, their average salaries in 1954, 1955 and 1956 to have been $16,156.25, $19,796.43 and $21,000, rent received by the taxpayer from the Clinic in 1954, $27,021.04, 1955, $25,230.55, and 1956, $37,425.33 and that: "said amounts represented at least reasonable rental for the facilities acquired and used by the Clinic." They were reported as rent on the taxpayer's returns and for the years they were paid, deducted on the Clinic's.

The taxpayer's gross and net income for the three years, under the stipulation, are shown as $89,336.06 and $27,466.04 and its charitable contribution as $21,476. Other pertinent provisions in the stipulation are referred to in footnote [4].

and care and to advance the plans and aspirations of its members that its property and its earnings will to the fullest extent possible be devoted to the advancement of the medical profession, care of the sick, medical education, research and public welfare, the following Articles of Association are hereby adopted:

"ARTICLE I

"The parties hereto do hereby associate themselves together under the name and style of HURON CLINIC for the purpose of carrying on and continuing the practice of medicine and surgery, therapeutics and medical and scientific research and education, which has heretofore been conducted under that name."

3. "The settlement referred to in paragraph XII above resulted in deficiencies including interest being assessed against the Clinic in the total sum of $46,380.76. In 1955 the Foundation repaid said amount to the Clinic. Upon audit of the Clinic's return for the year 1955 it was held that such repayment of said amount did not constitute taxable income to the Clinic but was in fact a recovery of excessive amounts paid to the Foundation by the Clinic under the formula in the Articles of Association referred to in paragraph X above".

4. "No part of the activities of the Huron Clinic Foundation during the years 1954 through 1956, or during any other years, consisted of carrying on propaganda or otherwise attempting to influence legislation. The Huron Clinic Foundation does not and never has participated in or in-

Taxpayer, showing a surplus account of $251,174.89 at the end of 1955, payment to the Clinic of the $46,380.76, a surplus at the close of 1956 of $207,213.14, and timely compliance with all regulatory requirements relating to the commencement of this action, are other facts, not controverted, which in conjunction with the preceding summary and others specified in the stipulation or admitted under the record, are hereby adopted as the factual basis underlying the contentions relied on in (2) and (3).

The taxpayer carries the burden, under this record to prove its claim that it operated exclusively for charitable purposes, that no part of its net earnings inured to the benefit of any private shareholder or individual and that it for those reasons had income tax exemption status under Section 501(a) of the Internal Revenue Code of 1954. Blansett v. United States, 8 Cir., 283 F.2d 474 (1960), Champ Spring Co. v. United States, 8 Cir., 47 F.2d 1 (1931), cert. den. 283 U.S. 852, 51 S.Ct. 560, 75 L.Ed. 1459, and Industrial Aggregate Co. v. United States, 8 Cir., 284 F.2d 639 (1960). The ultimate question in such a case is whether the taxpayer has overpaid his tax. Routzahn v. Brown, 6 Cir., 95 F.2d 766 (1938). It is like an action for money had and received and the taxpayer must show that the government has money which belongs to him. 123 East Fifty-Fourth Street v. United States, 2 Cir., 157 F.2d 68 (1946). Moreover, the taxpayer may not recover unless he has, in fact overpaid the taxes for the years in question, Willcuts v. Minnesota Tribune Co., 8 Cir., 103 F.2d 947 (1939), and the taxpayer must show the Commissioner not only to have been wrong but he must "further show the amount he is entitled to recover." Decker v. Korth, 10 Cir., 219 F.2d 732 (1955).

Those requirements are met and the taxpayer's contentions, that it operated exclusively for charitable purposes, compellingly demonstrated by the agreed on facts, the admissions made, the statute under consideration and the rule invoked in Boman, "* * * that the destination of income, rather than the source of income, is the ultimate test of exemption * * *." See also Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, C. F. Mueller Co. v. Commissioner, 3 Cir., 190 F.2d 120 (1951), Roche's Beach, Inc., v. Commissioner, 2 Cir., 96 F.2d 776 (1938), Debs Memorial Radio Fund v. Commissioner, 2 Cir., 148 F.2d 948 (1945), Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483 (1949), Willingham v. Home Oil Mill, 5 Cir., 181 F.2d 9 (1950), Arthur Jordan Foundation v. Commissioner, 7 Cir., 210 F.2d 885 (1954) and Sico Co. v. United States, 102 F.Supp. 197, 121 Ct.Cl. 373 (1952). This is so, since the facts here and in Boman are in no material respects different and since the 1954 exemption statute insofar as it relates to the mentioned operation, without dispute, is as it was under the Internal Revenue Code of 1939.

Postulations by the Government, as it seeks to refute, are predicated on charitable contributions from the taxpayer being small though the rentals from the Clinic were large, on extensive and rapid growth of its surplus, on the control interrelationship between the taxpayer and the Clinic, on arguments, that tax saving considerations played an "important role in the overall scheme", on "any non-

---

tervened in (including the publishing and distributing of statements) any political campaign on behalf of any candidate for public office.

"The Foundation has not been and is not operated for the primary purpose of carrying on a trade or business for profit within the meaning of Section 502 of the Internal Revenue Code of 1954.

The Foundation has never engaged in a prohibited transaction within the mean-

ing of Section 503 of the Internal Revenue Code of 1954.

"The Foundation has never accumulated amounts out of its income or used or invested any amounts of its income in a way which would cause the denial under Section 504 of the Internal Revenue Code of 1954 of the exemption of the Foundation under Section 501(c) (3) of the Internal Revenue Code of 1954."

tax purpose" not being in the plan for the formation of the taxpayer, on terms of its charter not preventing a resale of assets "to the Clinic at any price", on it being conceivable that the Boards of the two organizations "in a given year" could arrange to give free use to the Clinic of the building by having the expenses of the Clinic absorb its gross income and on the "possibility" that the net earnings could be increased and decreased at will because of the power of the Board of Governors of the Clinic to fix the salaries of its associate doctors and the implication that the other Board under the circumstances would not oppose.

Such circumstances, it is argued did not exist in Boman, where the rental was based on a fixed sixteen per cent of the costs or market value of the assets, whichever was greater, and where the parties by agreement could reduce the rent but never below the carrying charge on the real estate mortgage, and those arguments are carried to a conclusion by the observation: "While the stipulated facts in the present case show that a reasonable rental was paid by the Clinic to the Foundation during the years in controversy, the fact that it was possible for the rentals to be decreased without limit according to the arrangement between the Clinic and the Foundation is a strong indication that the Foundation in this case was not operated exclusively for charitable purposes. Thus, it is our

position that the taxpayer has failed to satisfy an essential requirement of exemption status under Section 501(c) (3)".

■■■ Taxpayer's accumulations of assets, without large expenditures for charity from time to time, absent charter provisions directing such use, obviously can not be construed as an operation having a noncharity and therefor a nonexempt tax aspect, and such an omission under the organization plan can not affect the ultimate destination of the assets held by the taxpayer. Not apt is the argument as to the tax savings' consideration, since such a facet is permitted whenever a tax-exempt charity is organized and as for a nontax purpose not having entered into the plan, suffice it to answer that the ultimate use of all of the assets are exclusively in charitable, scientific and educational fields, under the auspices of the medical school of the University of South Dakota.

■■ Idle observations, are fitting descriptions of the suggested possibilities that the specified ultimate destination could be thwarted by sale of the assets to the Clinic at any price and that the Clinic could get free use of the building by increases in salaries of the associate doctors. South Dakota statute, relating to organization and supervision of corporations for charitable purposes, forbids such manipulations, Section 37.0502 SDC 1939[5], In re Geppert's Estate, 75

5. "Corporate existence: annulment by; state's attorney; private person. An action may be brought by any state's attorney in the name of the state or by any person who has a special interest in the action, on leave granted by the Circuit Court or Judge thereof, for the purpose of vacating the charter or articles of incorporation, or for annulling the existence of corporations other than municipal, whenever such corporation shall:

"(1) Offend against any of the laws creating, altering, or renewing such corporation;

"(2) Violate the provisions of any law, by which such corporation shall have forfeited its charter or articles of incorporation by abuse of its power;

"(3) Have forfeited its privileges of franchises by a failure to exercise its powers;

"(4) Have done or omitted any act which amounts to a surrender of its corporate rights, privileges, and franchises;

"(5) Exercise a franchise or privilege not conferred upon it by law.

"It shall be the duty of any state's attorney, whenever he shall have reason to believe that any of these acts or omissions can be established by proof, to apply for leave, and upon leave granted, to bring an action in every case of public interest and also in every other case in which security shall be given to indemnify the state against the costs and expenses to be incurred thereby."

S.D. 96, 59 N.W.2d 727 (1953), State ex rel. v. Hutterische Bruder Gemeinde, 46 S.D. 189, 191 N.W. 635 (1922) [6], unorthodox practices of that kind are not permitted under the laws of this state as indicated by the cited authorities, Section 503 Internal Revenue Code 1954 [7] presents another barrier and practices ultra vires or illegal in character, may not be seized upon for inferences that the taxpayer's operations are not exclusively dedicated to charitable purposes.

The record as a whole leads to an impelling inference of high-minded administration on the part of the two Boards from the time the two organizations came into existence. There is no evidentiary basis for an inference that the suggested tax evasion tricks were being contemplated. Even so, it would have been no more than a state of mind showing an intent to evade and that is not enough. Fabreeka Products Co. v. Commissioner of Internal Revenue, 1 Cir., 294 F.2d 876 (1961). As said in that case: "Nevertheless unless Congress makes it abundantly clear, we do not think tax consequences should be dependent upon the discovery of a purpose, or a state of mind, whether it be elaborate or simple."

█ Upheld, also, is the taxpayer's further contention that no part of its earnings inured to the benefit of private shareholders or individuals, generally, because provisions in a lease based on a certain per cent of income, such as the ones in the lease to the Clinic, are held valid, Southern Ford Tractor Corp., 29 T.C. 833 (1958), A1958–2 C.B. 7, Brown Printing Co. v. Commissioner of Internal Revenue, 5 Cir., 255 F.2d 436 (1958), Midland Ford Tractor Co. v. Commissioner of Internal Revenue, 8 Cir., 277 F.2d 111 (1960), cert. den. 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 102, Potter Electric Signal and Manufacturing Co. v. Commissioner of Internal Revenue, 8 Cir., 286 F.2d 200 (1961), and more particularly, because no earnings of the Clinic during the tax period, were available to private shareholders or individuals, after its obligations to the taxpayer under the rent formula in the lease had been met.

█ Remaining for disposition, is the Government's further contention to the effect that the taxpayer is liable for payment of taxes on alleged unrelated business income, this, on the theory that the lease was a "business lease" and that the rent from the Clinic for the years 1954–1956, both inclusive, constituted such income. Invoked are Sections 511, 512, 512(b) (3), (4), 514(a) (1), (2), 514(b), 514(b) (2) (B), and 514(c), Internal Revenue Code 1954, and authorities that it is for the taxpayer to prove escape as well as overpayment. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293, and United States v. Pfister, 8 Cir., 205 F.2d 538 (1953). Hence, the question, with the existence of the "busi-

6. "Section 7, art. 17 of the state Constitution declares that:
"'No corporation shall engage in any business other than that expressly authorized in its charter, nor shall it take or hold any real estate except such as may be necessary and proper for its legitimate business.' * * * *
"Section 1, art. 17, provides only that the Legislature shall provide by general laws, for the organization of all corporations hereafter to be created, and the right (section 9, Id.) to—
"'alter, revise or annul any charter of any corporation now existing and revocable at the taking affect of this Constitution, or any that may be created, whenever in their opinion it may be in-jurious to the citizens of this state, in such a manner, however, that no injustice shall be done to the incorporators.'"

7. "Requirements for exemption (a) Denial of exemption to organizations engaged in prohibited transactions.—
"(1) General rule.—An organization described in section 501(c) (3) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after July 1, 1950; and an organization described in section 401(a) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after March 1, 1954."

ness lease" arrangement not in dispute, whether the taxpayer has a tax exemption shelter under Section 514(b) (B) (A) (i) Internal Revenue Code 1954:

"(A) No lease shall be considered a business lease if—(i) such lease is entered into primarily for purposes which are substantially related (aside from the need of such organization for income or funds or the use it makes of the rents derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501".

This subsection expresses a congressional intent to exclude from the category of "business leases" as defined in Section 514(b) (1), Internal Revenue Code 1954, a lease to a lessee engaged in activities substantially related to the purposes for which the lessor was organized and the primary purpose requirement is satisfied when such a relationship is shown to exist. Vol. 6, Mertens Law of Federal Income Taxation, page 59, 1960 Federal Tax Regulations, § 1.514(c) (1), and the discussion of the reasons which led to the imposition of income taxes on unrelated business in Mertens, supra, at pages 45–47 [8]. See also Lichter Foundation v. Welch, 6 Cir., 247 F.2d 431 (1957) and Boman v. Commissioner of Internal Revenue, supra.

The proof as to the existence of that relationship between the two organizations in this case is in the articles of incorporation of the taxpayer defining its purpose and in the Clinic's as it calls for promotion of specialization in the field of medicine, combined skills and experiences through the formation of the association, resulting benefit to the public, better care of the sick, advancement of the profession and its standards and other objects allied to and closely associated with those of the taxpayer's. The injected argument that the taxpayer's providing of the building needed by the Clinic, conferred "substantial benefits" and that the lease therefor was not primarily entered into for purposes within the ambit of the taxpayer's, is and must be rejected, since the parties have agreed that the rent paid was reasonable.

This decision is to be regarded as the court's findings of fact and conclusions

8. "§ 34.14a.—Unrelated Business Tax. The practice of conducting a profitable competitive business under the shelter of a tax-exempt status was spreading, particularly among charitable and educational institutions, and a wide variety of business activities had been engaged in by such organizations. Since under the 1939 Code many organizations were not required to file information returns, the data available to the Revenue Service did not disclose all the business activities in which such organizations participated.

In the Revenue Act of 1950, some of the Service's recommendations were enacted into the Code. In analyzing the provisions designed to cope with the abuses disclosed at the hearings on that Act, it is well to bear in mind that 'the problem at which the tax on unrelated business income is directed is primarily that of unfair competition.' The tax-exempt status of eleemosynary institutions had enabled them to use their profits tax-free to expand operations, while their competitors could expand only with the profits remaining after taxes. Also, in a number of instances, some of these organizations used their tax exemptions to purchase a business. They acquired commercial ventures with little or no investment on their own part and paid for it in installments out of subsequent earnings. Moreover, by reason of the fact that their earnings were not subject to tax, tax-exempt organizations were enabled to outbid taxable corporations in the purchase of other businesses.

The basic statutory provisions dealing with 'unrelated business income' of certain tax-exempt institutions were enacted as Sections 421 through 424 of the 1939 Code, collectively known as Supplement U. These sections were applicable by their terms to taxable years beginning after December 31, 1950, and are carried over into the 1954 Code as the 'unrelated business tax.' In general, the statutory scheme was to impose normal corporate tax rates upon the 'unrelated business income' of tax-exempt organizations organized in corporate form and individual tax rates upon trusts. * * *"
Note: For examples of unrelated trade or business see 1960 Federal Tax Regulations, § 1.513–1(a) (4).

of law and the taxpayer on that basis and on the record as a whole is entitled to recover the amount it seeks.

Counsel for the plaintiff, accordingly, will prepare form judgment and forward the same to the court for approval and entry.