**BROADWAY THEATRE LEAGUE OF LYNCHBURG, VIRGINIA, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 67–C–27–L.**

United States District Court
W. D. Virginia,
Lynchburg Division.

Oct. 23, 1968.

Edward S. Graves, Edmunds, Baldwin & Graves, Lynchburg, Va., for plaintiff.

Robert S. Irons, Asst. U. S. Atty., Roanoke, Va., for the United States.

## OPINION and JUDGMENT

DALTON, Chief Judge.

The Broadway Theatre League of Lynchburg, Virginia, Inc., hereinafter referred to as the League, brings this action pursuant to the provisions of 28 U.S.C.A. § 1346(a) (1), seeking to recover income taxes including interest and penalties imposed, alleged to have been erroneously and illegally assessed and collected by the Internal Revenue Service for the fiscal years ending April 30, 1963, and April 30, 1964. The basis of the claim is that the defendant wrongfully refused to grant the League exemption from federal income taxes under Section 501(a) of the Internal Revenue Code of 1954 as an organization described in Section 501(c) (3) of the United States Code.[1] Also, as a result of this action, it is alleged that the penalties assessed were without authority.

Generally, in order to sustain a claim for exemption under Section 501 (c) (3), the taxpayer must prove: "(1) that it was organized exclusively for charitable purposes, (2) that it is operated exclusively for charitable purposes, (3) that no part of its net earnings inured to the benefit of any private shareholder or individual, and (4) that no substantial part of its activities consist of carrying on propaganda or otherwise attempting to influence legislation." Huron Clinic Foundation v. United States, 212 F.Supp. 847 at 850 (D. South Dakota 1962) rev'd on other grounds 324 F.2d 43 (8th Cir. 1963). There is no dispute as to (4), and this court need only resolve the issues concerning (1), (2) and (3). Both parties, pursuant to Rule 56 of the Federal Rules of Civil Procedure, have moved for summary judgment. The facts relating to this case are not in dispute and are as follows:

The League was organized in 1962 in Lynchburg, Virginia, by a group of

---

1. Internal Revenue Code of 1954, 26 U.S. C.A. § 501.

   *Exemption From Tax on Corporations, Certain Trusts, etc.*

   (a) *Exemption From Taxation.*—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

   \*    \*    \*    \*    \*

   (c) *List of Exempt Organizations.*— The following organizations are referred to in subsection (a):

   \*    \*    \*    \*    \*

   (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

citizens interested in the theatre. Its purposes, as originally stated in its charter, were set forth in Article B:

"B. The purposes for which the corporation is formed are:

1. To promote and cultivate in the citizens of Lynchburg, Virginia, and its surrounding area, an interest in good theatrical performances of all kinds;

2. To provide for the citizens of Lynchburg, Virginia, and its surrounding area, an opportunity to enjoy professional theatrical performances;

3. To build and maintain, through a non-profit plan, a permanent theatre audience; and,

4. To foster and encourage the public appreciation and study of drama and the other fine arts in general."

The League is a non-stock, non-profit corporation organized under Virginia state law, with no members. It is governed by a self-perpetuating Board of Directors who serve without compensation, donating their services as a civic contribution. Workers, who solicit memberships by the sale of seasonal tickets during membership campaigns, receive no compensation. Students interested in the theatre are used as ushers and receive free admission to the plays, but no compensation.

The League has engaged and continues to engage services of various persons and organizations on a contractual basis in its operation. Such services include legal services, secretarial and clerical services, rental services of the E. C. Glass High School Auditorium, services of the local newspaper to publish publicity and the services of a booking agent. The League, in its first year of operation negotiated a contract with United Performing Arts, Inc., (hereinafter referred to as United), a booking agent. The contract was for a term of one year, with an option for renewal by the plaintiff.

· Because the contract and its terms are germane to the present controversy they are set forth in some detail. The contract consists of a printed form provided by United, with an addendum modifying some items appearing on the face of the printed form and adding other items. The major provisions of the contract provide that: the League shall annually conduct a membership campaign of at least a week's duration to sell seasonal tickets to a theatre series of not less than four attractions; the price of the seasonal tickets is to be mutually determined by United and the League; United is to provide campaign and promotional material for the membership drive; United is to endeavor to make available at least four high quality theatrical attractions during the theatrical season; the League shall deal exclusively with United for the term of the contract; no single admission tickets shall be sold to the general public; the League shall prepare and distribute suitable programs to the audiences with any monies received for the sale of advertising space belonging exclusively to the League; the League shall bear the expense of such things as local musicians, piano rental, transfer men, salaries of stage hands, cost of campaign dinners, cost of programs, etc., provided that no expense shall be incurred by United for the League without the League's prior written approval; the League shall pay United, as compensation for its services, fifteen percent (15%) of the aggregate membership dues; the League shall maintain accurate books and records of accounting open to United upon request; the agreement is for a term of one year with an option for one-year renewal by the League; the League acknowledges that United has an interest in the continuance of the League and that United shall have the right to attempt reorganization of the League if any or all of the officers resign or the League's continuance and permanence is for any other reason threatened; in the event that the funds raised by the League shall exceed its expenses, including the service fee to United, the League may use the funds as it so desires within its corporate structure as a non-profit organization; in the event a show fails to appear, and a mutually agreed upon substitute show

cannot be acquired, or a show is not presented because of the League's inability to obtain the E. C. Glass Auditorium, then United will reimburse the League twenty-five percent (25%) of the service fee paid to United by the League for each show not presented in a four show series or twenty percent (20%) of such fee for each show not presented of a five show series; that if the initial membership campaign should fail to enroll sufficient members, then the membership dues are to be refunded and in the event that less than $23,405.00 is raised by the membership dues, then United shall not be entitled to any compensation, the membership dues shall be refunded and no play shall be contracted for, or presented on behalf of the League; excepting the special provisions of first campaign drive for the first year, the campaign expenses shall be paid by the League. The contract was executed on April 9, 1962, and signed by a representative of United and by an officer of the League.

The League's first fiscal year ended on April 30, 1963. On June 4, 1963, the League submitted an application for exemption from federal income tax to the District Director in Richmond, Virginia. The application was forwarded to the National Office of the Internal Revenue Service (hereafter IRS) in Washington, D. C. and by letter dated January 9, 1964, the League was notified that it did not meet the organizational or operational requirements under Section 501(c) (3) of the Internal Revenue Code of 1954 for exemption from federal taxation under Section 501(a). The reasons stated for the denial of exemption were that the stated purposes for which the League was organized were broader than the charitable, educational or literary purposes specified in Section 501(c) (3) and that the operations, as indicated from the financial statements, do not qualify as being in furtherance of exempt purposes.

A protest to this ruling was filed by the League on February 7, 1964. In its protest the League argued that its purposes were charitable and educational since the promotion of theatrical perform-ances had traditionally been so regarded. It also argued that all charitable organizations had to obtain and pay for services and commodities from profit-making organizations, but that this in no way defeats the purposes of a charitable organization. In addition it was pointed out that the IRS letter denying exemption had incorrectly stated that the contract with United was a three year contract, when in fact, by virtue of the addendum executed simultaneously, it was a one year contract with a renewal option by the League.

By a letter dated February 17, 1965, the IRS reaffirmed its earlier ruling denying the exemption. The letter stated that cultural organizations devoted to the promotion of the arts which otherwise meet the statutory requirements for exemption under Section 501(a) of the Code of 1954 may qualify for exemption as educational or charitable. Rev.Rul. 64–174, 1964–1 Cum.Bull. 183; Rev.Rul. 64–175, 1964–1 Cum.Bull. 185. The letter further stated that the presentation of theatrical productions for the benefit of the community is included within the promotion of the arts; but that the promotion of the arts does not include aid to commercial theatre or other private interests. Because of the contractual relationship with United, the IRS ruled that the League was providing substantial aid to United in its commercial operation as a booking agent and therefore was not operated exclusively in furtherance of any of the purposes specified in Section 501(c) (3). In denying the exempt status, the IRS suggested that if the contract with United were terminated and the articles of incorporation of the League were amended to include only purposes within the provisions of Section 501(c) (3), that upon reconsideration an exempt status would be granted.

Following the suggestion of IRS, the League submitted a proposed amendment to its articles of incorporation to the IRS by letter. On June 21, 1965, the IRS answered the League's letter approving the language of the proposed amendment and suggested that if the League intend-

ed to reapply for exemption that the League include copies of the charter as amended and as approved by the State of Virginia, amendments to the by-laws, evidence of cancellation of the contract with United, copies of contracts with any subsequent booking agents, particulars of recent operations and proposed activities and copies of the League's financial statement for the fiscal year ending April 30, 1965.

The League reapplied for exemption and by letter dated December 16, 1965, the IRS held that the League was exempt from federal income tax as an organization described in Section 501(c) (3) of the 1954 Code as being organized and operated exclusively for charitable and educational purposes. The ruling was retroactive to July 12, 1965, the date of the amendment to the League's charter. The letter granting exemption states that the following information was the basis of the IRS decision: (1) that the articles of incorporation were amended, said amendment consisting solely of the replacing of Article B (set forth earlier in this opinion) with the following:

"B. The Corporation is organized exclusively for charitable, literary, and educational purposes within the meaning of Section 501 (c) (3) of the Internal Revenue Code of 1954; and in furtherance of and not in limitation of the foregoing to foster and encourage the public appreciation and study of drama and other fine arts, and to promote and provide for the public an opportunity to have the benefit of theatrical performances on a nonprofit basis."

(2) that the contract with United, although not formally cancelled, had expired and that the League has no intention to enter into any similar contract; (3) that the services of another booking agent, the National Performing Arts, has been utilized on a one-play basis and for a stated sum which the League considers reasonable; (4) that four theatrical attractions were presented during the 1964-5 season with the services of high school students as ushers, their only compensation being free admissions to the plays and; (5) that the proposed activities will continue to be in the nature of the present activities. Income tax returns filed for the period May 1, 1964, to April 30, 1965, were also considered. The IRS added that any contributions to the League after July 12, 1965, are deductible by the donors under 26 U.S. C.A. § 170, and that bequests, legacies, devises, transfers, or gifts to the League or for its use are deductible for federal estate and gift tax purposes under 26 U.S.C.A. §§ 2055, 2106 and 2522.

The financial results of the League from the initial year of operation through the fiscal year ending April 30, 1966, are as follows:

| Year | Gross Income | Paid United (or Successors) | Net Profit (Loss) Before Taxes | Members |
|------|-------------|----------------------------|-------------------------------|---------|
| 4–30–63 | $37,188.18 | $4,100.92 | $5,113.63 | 1,810 |
| 4–30–64 | 27,268.55 | 2,290.50 | 472.40 | 1,527 |
| 4–30–65 | 20,768.25 | 639.50 | (803.52) | 1,325 |
| 4–30–66 | 16,362.80 | —— | (1,118.95) | 1,001 |

The League was assessed and required to pay federal income tax of $1,534.09 for the fiscal year ending April 30, 1963, plus interest thereon of $152.62, paid March 3, 1965, less a refund of $241.06 and interest of $23.61 made June 21, 1966, as a result of a carryback of a loss from the fiscal year ending April 30, 1965. A penalty of $383.52 with interest included was paid as of March 24, 1965, the penalty being assessed for failure to file taxable returns on Form 1120, instead of the informational returns, Form 990–A, which are usually filed by exempt

organizations. A similar assessment and payment was made for the fiscal year ending April 30, 1964, the income tax being $123.01, interest being $4.74 and a penalty including interest of $30.68. The total sum paid for the years 1963 and 1964 including the interest, less the refund, constitutes the amount involved in this controversy, $1,963.99.

The questions presented to this court are: (1) Whether the League is entitled to exemption from federal income tax under Section 501(a) of the Internal Revenue Code of 1954 as a charitable, educational, and literary organization described in Section 501(c) (3) for the fiscal years ending April 30, 1963, and April 30, 1964. A subsidiary question should we decide adversely to the League is: (2) Whether the League is subject to the penalty imposed by § 6651 of the Internal Revenue Code of 1954, for failure to file timely tax returns on Form 1120, for the years in issue.

Section 501(c) (3) of the Code provides that an organization qualifying for exemption must be organized and operated exclusively for its stated exempt purposes with no part of the net earnings inuring to the benefit of any private shareholder or individual and no substantial part of the activities conducted to influence or aid legislation or to aid a candidate for political office. It is the IRS's position that the League has failed to meet the "exclusively organized" and "exclusively operated" tests specified in the statutory language of Section 501 (c) (3) as a prerequisite for exemption. The controversy in the present case does not revolve around the nature of the organization as affecting its exempt status, but rather around the specific language used in the original charter. It is not a question as to whether the production or presentation of professional theatre for the benefit of the public in Lynchburg on a non-profit basis is within the provisions of Section 501(c) (3), but whether the articles of incorporation, as originally drawn, are too broad to limit the League's activities to such a purpose.

It is clear that Congress contemplated two independent tests in applying Section 501(c) (3), one of creation (organization) and one of operation. While there are two independent tests, it seems that the only distinction between the two is the element of time. The organizational test was undoubtedly conceived and enacted to encourage a full disclosure as to the organization's intended method of operation and thus serves as a condition precedent to achieving an exempt status. The operational test would seem to be a condition subsequent enacted to insure that the organization would not deviate from its exempt purposes. To a degree the test of organization cannot be separated from the test of operation. Samuel Friedland Foundation v. United States, 144 F.Supp. 74 (D.N.J.1956). The statute makes no provision for the manner by which the purposes of an organization are to be ascertained. The organizational test is met, according to the regulations, Treas.Reg. § 1.501(c) (3)–1 (b) (1) (1959)[2] if the

2. Treas.Reg. § 1.501(c) (3)–1 (b) (1) (1959)

(b) *Organizational test—(1) In general.* (i) An organization is organized exclusively for one or more exempt purposes only if its articles of organization (referred to in this section as its "articles") as defined in subparagraph (2) of this paragraph:

(a) Limit the purposes of such organization to one or more exempt purposes; and

(b) Do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes.

(ii) In meeting the organizational test, the organization's purposes, as stated in its articles, may be as broad as, or more specific than, the purposes stated in section 501(c) (3). Therefore, an organization which, by the terms of its articles, is formed "for literary and scientific purposes within the meaning of section 501(c) (3) of the Code" shall, if it otherwise meets the requirements in this paragraph, be considered to have met the organizational test. Similarly,

articles of incorporation limit its purpose to one or more exempt purposes, and do not expressly empower it to engage, except insubstantially, in activities which in themselves are not in furtherance of one or more exempt purposes. From the government's brief, we perceive only one argument that relates solely to the organizational test; that the purposes of the League, as stated in the original articles of incorporation, were broader than allowed by Section 501(c) (3). The objectionable language in the original charter seems to be that which states that the League will attempt to create an interest in "good theatrical performances of *all* kinds," (emphasis added) on a nonprofit basis. The IRS argues that this is not synonymous with the charitable, educational, or literary purposes specified in Section 501(c) (3). The IRS, by its letter to the League dated February 7,

1965, has agreed that cultural organizations devoted to the promotion of the arts, including the presentation of theatrical productions for the benefit of the public, may qualify for exemption under Section 501(a) as educational or charitable. Rev. Rul. 64–174, 1964–1 Cum.Bull. 183; and Rev.Rul. 64–175, 1964–1 Cum.Bull. 185; See Treas.Reg. § 1.501(c) (3)–1 (3) (ii) (1959).[3] We do not think the use of the word "all" can be extracted and used as a sword to deny exemption when the purposes read together undeniably state that the League was organized to bring professional theatre to Lynchburg on a nonprofit basis for the benefit of the public. It is not unusual for charters of corporations to grant broad powers that are never intended to be used. Commissioner of Internal Revenue v. Battle Creek, Inc., 126 F.2d 405, 406 (5th Cir. 1942). The courts have found Section 501(c) (3) to

articles stating that the organization is created solely "to receive contributions and pay them over to organizations which are described in section 501(c)(3) and exempt from taxation under section 501 (a)" are sufficient for purposes of the organizational test. Moreover, it is sufficient if the articles set forth the purpose of the organization to be the operation of a school for adult education and describe in detail the manner of the operation of such school. In addition, if the articles state that the organization is formed for "charitable purposes", such articles ordinarily shall be sufficient for purposes of the organizational test (see subparagraph (5) of this paragraph for rules relating to construction of terms).

(iii) An organization is not organized exclusively for one or more exempt purposes if its articles expressly empower it to carry on, otherwise than as an insubstantial part of its activities, activities which are not in furtherance of one or more exempt purposes, even though such organization is, by the terms of such articles, created for a purpose that is no broader than the purposes specified in section 501(c)(3). Thus, an organization that is empowered by its articles "to engage in the manufacturing business", or "to engage in the operation of a social club" does not meet the organizational test regardless of the fact that its articles may state that such organization is created "for charitable purposes within the meaning of section 501(c)(3) of the Code."

(iv) In no case shall an organization be considered to be organized exclusively for one or more exempt purposes, if, by the terms of its articles, the purposes for which such organization is created are broader than the purposes specified in section 501(c)(3). The fact that the actual operations of such an organization have been exclusively in furtherance of one or more exempt purposes shall not be sufficient to permit the organization to meet the organizational test. Similarly, such an organization will not meet the organizational test as a result of statements or other evidence that the members thereof intend to operate only in furtherance of one or more exempt purposes.

(v) An organization must, in order to establish its exemption, submit a detailed statement of its proposed activities with and as a part of its application for exemption (see paragraph (b) of § 1.501 (a)–1).

3. Treas.Reg. § 1.501(c)(3)–1 (3) (ii) (1959)

(ii) *Examples of educational organizations.*
The following are examples of organizations which, if they otherwise meet the requirements of this section, are educational:

*Example (4).* Museums, zoos, planetariums, symphony orchestras, and other similar organizations.

be remedial and have applied the doctrine of liberality when construing it. Seasongood v. Commissioner of Internal Revenue, 227 F.2d 907 (6th Cir. 1955); Arthur Jordan Foundation v. Commissioner of Internal Revenue, 210 F.2d 885, 889 (7th Cir. 1954); C. F. Mueller Co. v. Commissioner of Internal Revenue, 190 F.2d 120, 122 (3rd Cir. 1951); Commissioner of Internal Revenue v. Citizens and Southern Nat. Bank, 147 F.2d 977, 979 (5th Cir. 1945); Bohemian Gymnastic Ass'n Sokol of City of New York v. Higgins, 147 F.2d 774, 777 (2d Cir. 1945); United States v. Proprietors of Social Law Library, 102 F.2d 481, 482 (1st Cir. 1939); Cochran v. Commissioner of Internal Revenue, 78 F.2d 176, 179 (4th Cir. 1935). Using the doctrine of liberality which resolves construction ambiguities in favor of the taxpayer and rejecting a standard which would impose strict form over substance, we find nothing in the League's charter that is violative of the provisions of Section 501(c)(3) from a purely organizational standpoint.

The main controversy stems around the League's contractual relationship with United. Although both parties have argued and intermixed this contractual relationship with both the organizational and operational test, we will discuss it as it related to the operational aspects of the League, since the League must necessarily have come into existence as a legal entity before it could enter into any binding contractual obligation.

According to the regulations, an organization is regarded as "operated exclusively" for exempt purposes only if it engages primarily in activities which accomplish one or more exempt purposes specified in Section 501(c)(3) of the 1954 Code. Treas.Reg. § 1.501(c)(3)-1 (c)(1)(1959).[4] It is the government's position that because of certain of the contract provisions that the League is not "exclusively operated" for the exempt purposes set out in their charter. The terms of the contract are set forth elsewhere in this opinion and it is not necessary to restate them. The IRS does not argue that the League does not have the right to enter contracts or to pay for services or goods necessary in the conduct of the League's exempt activities. Rather, it argues that the provisions of the contract envision such a control that it may be concluded that the League was organized and was operated for the benefit of United. To support this position the IRS cites the provisions of the contract that (1) gives United the right to reorganize the League and take over the subscription functions, and (2) provides that no single admission tickets could be sold, only seasonal tickets. From this the IRS concludes that United controlled ad-

4. Treas.Reg. § 1.501(c)(3)-1 (c)(1959)
  (c) *Operational test*—(1) *Primary activities.*
  An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.
  Treas.Reg. § 1.501(c)(3)-1 (d)
  (d) *Exempt purposes*—(1) *In general.*
  (i) An organization may be exempt as an organization described in section 501(c)(3) if it is organized and operated exclusively for one or more of the following purposes:
    (a) Religious,
    (b) Charitable,
    (c) Scientific,
    (d) Testing for public safety,
    (e) Literary,
    (f) Educational, or
    (g) Prevention of cruelty to children or animals.
  (ii) An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

vertising, promotion, determination of subscription fees and campaigns for subscriptions. In short, the government argues that the League was organized in part for the benefit of United and that although it is not shown that United was instrumental in organizing the League, it appears that the League *could* be both organized and operated primarily for the benefit of United, the benefit being that United would be assured of realizing commissions from the sale of seasonal tickets and of having an outlet for second and third class theatrical casts.

The government's argument is misdirected. The terms of the contract neither detract nor add to the exempt purposes for which the League was created. Nor, as we view the provisions of the contract, do the terms impose a controlling superstructure over the League's operation. As evidence of this, we note the various addendums to the contract that limit and decrease the terms of the printed form contract. Particularly, we note that the contract was reduced from a three year term to a term of one year by virtue of the addendum. Also by addendum it was provided that United could incur no expense on behalf of the League without prior written approval. Other provisions added in the addendum include a rebate of part of the service fee for failure of a show to materialize; changes in funding of campaign drives for members; a mutual "pull-out" provision should the total number of memberships not total a certain amount; and a notification of the plays to be presented before the theatre season.

■■ As to the provision that allows the reorganization of the League, the contract provides that such a right is only available should the officers resign or the League's existence be threatened. This provision has never been effective, nor do we think that its terms should be viewed as infringing upon the exempt purposes for which the League has been formed. It is important to remember that the status of the League, not United, is the one in question. It is certainly possible that an organization, that has

qualified for exemption, may during its existence deviate from its purposes so that its exempt status is no longer justified and may be removed. This is true of all exempt organizations. Yet the mere possibility of this occurrence should not be enough to deny the organization an exemption if all the other provisions of Section 501(c) (3) are satisfied. In Science and Research Foundation, Inc. v. United States, 181 F.Supp. 526, 529 (S.D. Ill.1960) where a contract with a disassociated organization was questioned in relation to the exempt status of the foundation, the court said:

It must be kept in mind that the law and the regulations refer to the taxpayer itself. The law and the regulations do not refer to a disassociated corporation who might, for instance, print the advertising for a community chest or the literature explaining the same. These things must be paid for, and the statute does not prohibit or forbid such activities. The evidence in this record shows that taxpayer is not a subterfuge to subsidize Associates. There is no connection whatsoever between taxpayer and Associates. The statute says " * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * I. R. C. Sec. 501 (c). These words clearly and without question refer to the corporation contemplated in the first sentence of the statute. They do not refer to a corporation that might be employed to print the pamphlets, booklets and literature and to market the same, even though a profit might be involved to Associates. (Any profit made by Associates, a profit corporation, is subject to the "Income Tax Act".) It is not possible to read such into the intention of Congress in passing Sec. 501. If such were the law, it would not be possible to have an exempt organization under the law. Certainly such was not the intention of Congress, and it is equally clear from the record in this case that no profit accrued to the taxpayer, or to any private share-

holder or individual connected with taxpayer. In fact, you find in this record only people who were devoted to carrying out the purpose of the corporate creation of dissemination of knowledge. It cannot be said, in the light of this record, that taxpayer's activities are largely animated for a commercial purpose, or that the contract herein was for a supposed commercial objective, and the further fact is that taxpayer had no great financial gain. 181 F.Supp. at 529.

The compensation for the services of United was fifteen percent of the aggregate membership dues. The government does not argue that this contingency fee is unreasonable, nor do we find evidence to this effect. An organization can incur ordinary and necessary expenditures in its regular activities without losing its exempt status. St. Germain Foundation v. Commission, 26 TC 648 (1956); A. A. Allen Revivals, Inc., PH TC Memo 1963–281. A contract entered into by a foundation, for its benefit, even if the contract is responsible for the creation of the foundation, is not necessarily as a matter of law executed to avoid taxation. Commissioner of Internal Revenue v. Orton, 173 F.2d 483 (6th Cir. 1949). We are convinced, for the reasons cited, that the League, as operated, was operated exclusively for purposes within the provisions of Section 501(c) (3) and that, therefore, the denial of the exemption on this basis for the years in question was not proper.

■ A final argument presented by the government deals with the prohibition against the inurement of any of the net earnings to the benefit of any shareholder or private interests, such as designated individuals. As we understand the government's argument, it is to the effect that the people buying the seasonal tickets form a "cooperative" and that such an undertaking is not for the benefit of the public, but rather for the benefit of the individual members of the cooperative. This argument is not convincing. The articles of incorporation of the League expressly provide that no part of the net earnings of the corporation shall inure to the benefit of any director.[5] The directors, as noted earlier, receive no compensation for the services. It is further provided that upon dissolution of the League, any existing net proceeds will be distributed to an exempt organization.

The prohibition in Section 501(c) (3) against any benefit inuring to private shareholders or individuals clearly and without question refers to the organization contemplated in the first sentence of the statute and not to any disassociated organization such as the legal services, secretarial services, or from what we have decided, an organization like United who has a bona fide contractual relationship with an exempt organization. Nor do we think that the persons who purchased seasonal tickets can be categorized as designated individuals who would fall within the prohibition in the statute. A membership drive was conducted each year to sell seasonal tickets to the public. No individuals were designated; any individual for the price of a ticket could attend the theatrical performances. The sale of seasonal tickets, rather than single admission tickets, was to insure the financial success of the theatrical season in advance. We think this nothing more than a cautious business practice designed to carry forth the purposes for which the League was cre-

5. Article E of the League's charter provides that:

"E. No part of the net earnings of the corporation shall inure to the benefit of any director. In the event of dissolution, all assets of the corporation, or the net proceeds from the sale thereof, shall be distributed under the direction of the directors to one or more corporations, associations, trusts, funds, or foundations created in the United States and organized and operating exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the earnings of which inures to the benefit of any private shareholder or individual and no part of the actions of which is carrying on propaganda or attempting to influence legislation."

ated and to insure the success of such a venture. The terms "designated individuals" or "cooperative" in reference to this arrangement would at best be a distortion of the League's actual operation in dealing with the public or of the nature of the League in general.

In summary, during the taxable years ending April 30, 1963, and April 30, 1964, the League was exempt from income tax under Section 501(a) of the Internal Revenue Code of 1954, as an organization described in Section 501(c) (3). It follows that the League is entitled to recover the amount of the income taxes, interest and penalties paid for those taxable years, together with interest thereon.

It therefore follows that the defendant's motion for summary judgment must be denied and the plaintiff's motion granted.

An appropriate order for judgment may be submitted.