PLUMSTEAD THEATRE SOCIETY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12139–78X.    Filed September 18, 1980.

*William J. Lehrfeld,* for the petitioner.
*Carolyn A. Boyer,* for the respondent.

## OPINION

WILBUR, *Judge:* Respondent determined that petitioner does not qualify for exemption from Federal income tax as a charitable or educational organization under section 501(c)(3).[1] Petitioner challenges respondent's determination and has invoked the jurisdiction of this Court under section 7428 for a declaratory judgment. All of the prerequisites for declaratory judgment have been satisfied.[2] The issue for our decision is whether petitioner is operated exclusively for charitable or educational purposes within the meaning of section 501(c)(3).

This case was submitted on a stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The stipulated record is incorporated herein by this reference. The evidentiary facts and representations contained in the administrative record are assumed to be true for the purposes of this proceeding.

Petitioner Plumstead Theatre Society was incorporated on January 18, 1977, as a nonprofit corporation under the laws of the State of California. Its principal place of business is in Los Angeles, Calif. It filed its application for recognition of exemption under section 501(c)(3) on June 17, 1977, with the Internal Revenue Service. On July 31, 1978, respondent issued to petitioner a final adverse ruling denying petitioner exempt status under section 501(c)(3). The reasons stated in the letter for denial are:

You are not operated exclusively for charitable or educational purposes within the meaning of section 501(c)(3) of the Code. A substantial purpose of your organization is a commercial purpose which is not an exempt purpose. Additionally, part of your net earnings will inure to the benefit of a private individual or shareholder. Furthermore, you are operated for private interests rather than public interests.

As stated in its articles of incorporation, petitioner was formed as a nonprofit corporation for the following specific and primary purposes:

To cultivate, promote, foster, sponsor, develop, and encourage understanding of and public interest in the fields of theatre, dance, music, motion pictures, and the arts, all of the classic nature, whether ancient or contemporary;

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise expressly indicated.

[2] Petitioner is the organization whose qualification is at issue, sec. 7428(b)(1); petitioner exhausted its administrative remedies, sec. 7428(b)(2); and petitioner filed its petition before the 91st day after respondent mailed his determination, sec. 7428(b)(3).

To promote and encourage talent and ability in composition and creation of, as well as performance of, works in each of the said fields, through commissions for new and original works, awards and scholarships and grants to existing organizations and individuals active in these fields; to provide a training ground and workshop to develop dancers, choreographers, playwrights, writers, artists, composers, performers, designers, directors, musicians, technicians, and administrative personnel and the like in each of these fields;

To institute, organize and conduct workshops where the foregoing can meet, study, discuss, exchange and develop techniques in each of these fields;

To give recognition to experiments and achievements in each of these fields through citations, awards, scholarships and grants to individual writers, performers, organizations and the like; and to give public performances in each of the above fields.

To receive contributions and to make donations to, dispense contributions to, and otherwise aid and support those organizations qualified for exemption from federal income tax under the Internal Revenue Code of 1954, as now in effect or subsequently amended, that are organized and operated exclusively for the above mentioned purposes.

In addition, the articles of incorporation provide that petitioner is not organized and shall not be operated for pecuniary gain; that no part of its net earnings shall inure to the benefit of any private member or individual; that upon dissolution, any remaining assets shall be distributed to a nonprofit organization organized for the same purpose as petitioner and qualifying as tax exempt, under section 501(c)(3).

The members of the board of directors of petitioner are a diversified group of individuals interested in the performing arts. No officer or director is salaried in his or her capacity as an officer or director of petitioner. Several members of the board of directors advanced non-interest-bearing loans ranging from $100 to $250 to petitioner to cover initial costs of incorporation.

Initially, petitioner proposes to fulfill its purposes by presenting professional dramatic theatre productions of the classical nature, ancient and contemporary; by forming a workshop in the Los Angeles area for new American playwrights; and by establishing a fund to assist new and established playwrights in writing new plays for petitioner to produce. During 1977, petitioner engaged in extensive negotiations with Ambassador International Cultural Foundation (the Ambassador Foundation), a nonprofit, cultural foundation, for joint sponsorship by petitioner and Ambassador College of a season of three family-

oriented plays to be shown in the Ambassador Auditorium in Pasadena, Calif. Petitioner chose Ambassador Auditorium as the site for its resident theatre with the hope of rebuilding the theatre audiences from Glendale, San Gabriel, Orange County, and San Bernardino County after the demise of the Pasadena Playhouse. An agreement between petitioner and the Ambassador Foundation setting forth the respective rights and duties of each entity with regard to the production of the season of plays in Pasadena was executed on July 27, 1977.

Petitioner intends to use accomplished performers, directors, and technicians in its productions. Because petitioner is organized as a nonprofit corporation, it is able to operate under an Equity League of Resident Theatres Contract (LORT contract) which provides for lower compensation for the professionals used in its productions than that which is normally demanded of commercial theatre. As of December 1977, approximately 60 theatre companies in the United States, all tax-exempt, nonprofit corporations, used the LORT contract.

Petitioner plans to present its productions in Pasadena, Calif., and Washington, D.C., and in any other city where subscription prices and/or theatre guarantee will help defray the costs of production. Petitioner contemplates that contributions, donations, and low-cost loans will cover production costs and that ticket sales and/or theatre guarantees will cover the running costs. Any profits that may accrue to petitioner from specific performances will be used to fund future production projects, a playwriting commission for American playwrights, and an experimental workshop for actors and playwrights.

On August 15, 1977, petitioner entered into an agreement with the John F. Kennedy Center for the Performing Arts (Kennedy Center), a nonprofit tax-exempt organization, to coproduce the play, "First Monday in October" (First Monday). Under the agreement, petitioner and the Kennedy Center were each to provide one-half of the capitalization required for the production, and to share equally any profits or losses derived from the presentation of the play in Washington. Petitioner's president, Henry Fonda, starred in the play and agreed to accept a lesser salary than he would normally demand of commercial theatre, and to waive a royalty interest in the gross receipts. The play premiered at the Kennedy Center on December 26, 1977. The Washington, D.C., production of First Monday was petitioner's

only theatrical production prior to the issuance of the final adverse letter ruling by respondent. Upon completion of the run of First Monday at the Kennedy Center, there remained over $90,000 in unrealized production costs with respect to the presentation of the play.

Prior to the premiere of First Monday at the Kennedy Center, petitioner encountered difficulties in raising its share of capitalization costs required for the production. In order to meet its obligations under the agreement with the Kennedy Center, petitioner sold a portion of its rights in First Monday to outside investors through a limited partnership entitled the First Monday in October Co. (the partnership). Petitioner is the general partner, and two individuals and Pantheon Pictures, Inc., a for-profit corporation, are the limited partners. The purpose of the partnership was to coproduce First Monday in Washington, D.C., and to individually produce or coproduce the play in New York or elsewhere. Under the partnership agreement, the limited partners were required to contribute capital to the partnership totaling $100,000. In return, they collectively received a 63.5 percent share in any profits or losses resulting from the production of First Monday. Petitioner was not required to make a capital contribution to the partnership. Petitioner closed First Monday on February 24, 1978, at a loss.

The issue for our decision is whether petitioner qualifies as a tax-exempt organization under section 501(c)(3). Respondent does not dispute that petitioner is organized for charitable and educational purposes, the first test an organization must pass in order to qualify for exemption. Rather, it argues that petitioner is not operated exclusively for charitable purposes within the meaning of section 501(c)(3), because petitioner has a substantial commercial purpose and is operated for the benefit of private, rather than public interests.[3] Petitioner maintains that it is operated in a manner harmonious with the requirements of section 501(c)(3). We agree with petitioner that it is operated exclusively for charitable and educational purposes under section 501(c)(3).

---

[3] In its final adverse letter ruling, respondent listed an additional ground for the denial of exemption, that of inurement of net earnings to the benefit of a private individual or shareholder. On brief, respondent abandoned this argument, conceding that petitioner's net earnings do not flow to private shareholders or to "persons having a personal and private interest in the activities of the organization." See sec. 1.501(a)–1(c), Income Tax Regs.

Section 501(a)[4] exempts from Federal income tax any organization which meets the criteria set forth in section 501(c). Section 501(c)(3)[5] provides that a corporation which is organized and operated exclusively for charitable or educational purposes, among others, is an organization referred to in section 501(a), if no part of its net earnings inures to the benefit of any private individual or shareholder, and if it does not engage in other prohibited activity. It has long been recognized that the promotion and encouragement of the arts can be both charitable and educational. *Broadway Theatre League of Lynchburg, Va. v. United States,* 293 F. Supp. 346 (W.D. Va. 1968); 6 J. Mertens, Law of Federal Income Taxation, sec. 34.09, p. 45 (1975 rev.); B. Hopkins, Law of Tax Exempt Organizations, sec. 6.9, pp. 84–86 (3d ed. 1979). Cultural organizations such as museums, symphony orchestras, ballet, opera, repertory, modern dance, theatre, and other similar organizations may clearly qualify for tax-exempt status as educational and/or charitable organizations under section 501(c)(3), so long as the activities of the organization are in furtherance of its exempt purpose. See sec. 1.501(c)(3)–1(d)(3)(ii), example (*4*), Income Tax Regs. These organizations are viewed as charitable and educational because they promote public appreciation of the arts, considered useful to the individual and beneficial to the community, as well as provide instruction and training to individuals for the purposes of improving or developing their capabilities. See secs. 1.501(c)(3)–1(d)(2) and 1.501(c)(3)–1(d)(3), Income Tax Regs.

Indeed, respondent has recognized in his revenue rulings that

---

[4]Sec. 501(a) provides:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

[5]Sec. 501(c)(3) provides in pertinent part:

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

*　　*　　*　　*　　*　　*　　*

(3) Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

organizations devoted to the promotion of the arts may qualify for tax exemption. In Rev. Rul. 64–175, 1964–1 C.B. (Part 1) 185, respondent ruled that a nonprofit corporation organized and operated primarily for the purpose of developing the interest of the American public in the dramatic arts, qualified for exemption under section 501(c)(3). The main activity of the organization described in the ruling was that of producing plays and making classical works of the theatre available in cities throughout the United States by means of a permanent touring repertory theatre company of the highest professional standards. In ruling that the theatre company qualified for tax exemption, respondent stated that the repertory company is educational, much in the same way a symphony orchestra is educational, for purposes of section 501(c)(3). Similarly, in Rev. Rul. 73–45, 1973–1 C.B. 220, respondent ruled that a nonprofit organization created to foster the development of an appreciation for drama in a particular community by sponsoring professional theatrical productions qualified for tax exemption under section 501(c)(3). The organization was not deemed to be operated for private rather than public benefit, even though it procured the theatre productions through a renewable contract with a commercial booking agency that had also played a major role in its creation.

In spite of public acknowledgment that nonprofit corporations which produce and present dramatic plays to the American public in furtherance of an exempt purpose of promoting cultural arts may qualify for tax exemption, respondent ruled adversely for petitioner in the instant case. First, respondent argues that petitioner has a substantial commercial purpose which defeats tax-exempt status under section 501(c)(3). See *Better Business Bureau v. United States*, 326 U.S. 279 (1945). Rephrased, respondent argues that despite the stated purposes in its articles of incorporation, petitioner is operating in a manner indistinguishable from a commercial enterprise involved in the business of producing plays, because its only activity thus far is coproducing (with the Kennedy Center) a play that has a commercial hue.

We do not believe the administrative record supports such a contention. It is clear from the record that petitioner's main focus is to organize a regional theatre in Pasadena, Calif., to produce and present plays for an area that lacks a community

theatre. Toward this goal, members of the board of petitioner have spent countless uncompensated hours negotiating a contract with Ambassador College for the use of its auditorium to house a season of three dramatic productions. An arrangement was worked out with the Ambassador International Cultural Foundation to jointly sponsor the plays. A committee was formed to review and select appropriate dramatic plays in accordance with the highest literary and artistic standards.

We do not agree with respondent that because these productions, as well as the planned community workshops for actors and playwrights and the fund for American playwrights, have yet to materialize, they do not count as activities. Respondent took a still shot of what is an ongoing motion picture of many dimensions. It is quite clear that petitioner is anxious to effectuate its projects as soon as it can obtain funding. Especially in the formative years, a nonprofit community theatre needs a great deal of financial support in the form of contributions and donations before it can function. See Rockefeller Panel Report, "The Performing Arts: Problems and Prospects," p. 62 (1965). Until it is declared tax exempt, solicitation for foundation support and individual contributions is useless.

Nor do we agree with respondent that the activity of coproducing the play, "First Monday in October," with the Kennedy Center is indicative of a substantial commercial purpose. In fulfilling its goals of promoting and fostering the American dramatic arts, petitioner plans not only to resurrect past literary works, but to encourage and develop new and original theatre productions. Indeed, developing new works of artistic quality is considered one of the obligations of a nonprofit performing arts organization. See Rockefeller Panel Report, *supra* at 55.

Respondent has not alleged that petitioner should not be allowed to produce and present original plays. Rather, it points to the manner in which First Monday was presented—that it was advertised in newspapers, that tickets were sold, that professionals were used in the productions—to argue that petitioner has a substantial commercial purpose.

We feel that respondent is completely misdirected in his objections. The Kennedy Center is a tax-exempt organization chartered by Congress and built partially with Federal funds. For major theatrical performances, it generally advertises in the

newspaper, charges the public for tickets, and uses paid professionals. Symphony orchestras are considered per se educational under section 501(c)(3). See sec. 1.501(c) (3)–1(d)(3)(ii), example (4), Income Tax Regs. Yet, they too advertise performances, sell tickets, and pay their musicians, and such activity does not render them "substantially commercial." Indeed, all nonprofit performing arts organizations, from opera to ballet to theatre to symphony orchestras, depend upon ticket sales to cover a portion of their operating budgets. See 1 Ford Foundation, Finances of the Performing Arts 64–67 (1974); Rockefeller Panel Report, *supra* at 53–56. The purpose of presenting dramatic productions is for the public to see, to appreciate, to reflect, and to be educated. Nothing in section 501(c)(3) dictates that the public find out about petitioner's performances through word of mouth, that they be forced to watch amateurs act, or that they be seated totally free of charge. The kind of activity respondent deems objectionable in the instant case is no different from that which he has sanctioned on public record. See Rev. Rul. 73–45, 1973–1 C.B. 220; Rev. Rul. 64–175, 1964–1 C.B. (Part 1) 185.

Admittedly, the line between commercial enterprises which produce and present theatrical performances and nonprofit, tax-exempt organizations that do the same is not always easy to draw. Indeed, the theatre is the most prominent area of the performing arts in which commercial enterprises coexist, often in the same city, with nonprofit, tax-exempt charitable organizations that also sponsor professional presentations. See B. Hopkins, Law of Tax Exempt Organizations, sec. 6.9, p. 38 (3d ed. 1979).[6]

However, there are differences. Commercial theatres are operated to make a profit. Thus, they choose plays having the greatest mass audience appeal. Generally, they run the plays so long as they can attract a crowd. They set ticket prices to pay the total costs of production and to return a profit. Since their focus is perennially on the box office, they do not generally organize other activities to educate the public and they do not

---

[6]Hopkins uses by way of illustration, the John F. Kennedy Center for the Performing Arts, a nonprofit, tax-exempt organization, and the National Theatre, a commercial enterprise, both located in Washington, D.C.; and New York City's nonprofit Lincoln Center which coexists adjacent to the quintessence of commercial theatre, Broadway. See B. Hopkins, Law of Tax Exempt Organizations, sec. 6.9, pp. 85–86 (3d ed. 1979).

encourage and instruct relatively unknown playwrights and actors.

Tax-exempt organizations are not operated to make a profit. They fulfill their artistic and community obligations by focusing on the highest possible standards of performance; by serving the community broadly; by developing new and original works; and by providing educational programs and opportunities for new talent. Thus, they keep the great classics of the theatre alive and are willing to experiment with new forms of dramatic writing, acting, and staging. Usually, nonprofit theatrical organizations present a number of plays during a season for a relatively short specified time period. Because of a desired quality in acoustics and intimacy with the audience, many present their performances in halls of limited capacity. The combination of the shortness of the season, the limited seating capacity, the enormous costs of producing quality performances of new or experimental works, coupled with the desire to keep ticket prices at a level which is affordable to most of the community, means that, except in rare cases, box office receipts will never cover the cost of producing plays for nonprofit performing arts organizations.[7] See Rockefeller Panel Report, *supra* at 53–62. We feel that petitioner has shown that it is organized and operated similar to other nonprofit theatre organizations, rather than as a commercial theatre.

Respondent's last argument is that because of the partnership petitioner entered into with two private individuals and a corporation, whereby the limited partners provided capital in exchange for an interest in the profits and losses of First Monday, petitioner is operated for private, rather than public interests. We do not agree. After entering into an agreement with the Kennedy Center, petitioner discovered it was in need of funds for its share of the capitalization costs of First Monday. The record shows that in an arm's-length transaction, it obtained those funds by selling a portion of its interest in the play itself, for a reasonable price. Petitioner is not obligated for the return

---

[7]On the average, earned income (mainly box office receipts) for the larger, better known nonprofit theatres accounts for approximately two-thirds of their annual budgets; the rest must come from other sources. See R. Anderson and S. Maltezou, "The Economic Condition of the Live Professional Theatre in America," Research in the Arts, Proceedings of the Conference on Policy Related Studies of the National Endowment for the Arts, pp. 63–65 (1977).

of any capital contribution made by the limited partners from its own funds, and the partnership has no interest in petitioner or in any other plays it is planning to produce. The limited partners have no control over the way petitioner operates or manages its affairs, and none of the limited partners nor any officer or director of Pantheon Pictures, Inc., is an officer or director of petitioner. We find this arrangement, limited to one play produced by petitioner, is no more intrusive or indicative of private interests than the contractual, percentage arrangement approved of in *Broadway Theatre League of Lynchburg, Va. v. United States*, 293 F. Supp. 346 (W.D. Va. 1968).[8]

Therefore, we find that petitioner is organized and operated exclusively for charitable and educational purposes under section 501(c)(3).

*An appropriate order will be entered.*

---

[8]We note that respondent has quite properly abandoned his initial argument that this arrangement resulted in private inurement. He now simply contends the agreement reflects a private rather than a public purpose—apparently arguing petitioner has commercial rather than artistic objectives. However, even assuming that these objections may be so neatly bifurcated and that First Monday was a commercial venture, the play was only one of many to be produced, and plays were only one of the contemplated means through which petitioner intends to advance the arts. At most, any profits from the play might under this theory be subject to the tax on unrelated business income, but it would not be inimical to exempt status. See K. Eliasberg, "Charity and Commerce: Section 501(c)(3)—How Much Unrelated Business Activity?", 21 Tax L. Rev. 53, 83 (1965). Cf. *Industrial Aid for the Blind v. Commissioner*, 73 T.C. 96 (1979).